Dennis Mitchell ORBE, Petitioner,

v.

William Page TRUE, Warden, Sussex I State Prison, Respondent.

No. CIV.A.01–1845–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 27, 2002.

Robert Lee Jenkins, Jr., Bynum & Jenkins, P.L.L.C., Alexandria, VA, Michelle Jill Brace, Virginia Capital Representation Res. Ctr., Charlottesville, VA, for petitioner.

Katherine Pharis Baldwin, Office of the Attorney General, Richmond, VA, for respondent.

## MEMORANDUM OPINION

ELLIS, District Judge.

Petitioner Dennis Mitchell Orbe was convicted of capital murder in the Circuit Court for York County on August 13, 1998, and thereafter sentenced to death in accordance with the jury verdict on October 27, 1998. After unsuccessfully challenging the imposition of the death penalty both on direct appeal and in state collateral proceedings, Orbe now petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter is before the Court on respondent's motion to dismiss the petition, which, for the reasons stated below, must be granted.

## I. Facts [1]

Dennis Mitchell Orbe was convicted of capital murder for shooting a convenience store clerk at a gas station in York County, Virginia, in the early morning of January 24, 1998. The incident was recorded on videotape by the store's security camera system, and was eventually shown to the trial jury. At 3:38 a.m. on January 24, Orbe entered the store. He had been in the store twice on the previous day without buying anything. On this occasion, Orbe walked up to the check-out counter and pointed a revolver at the chest of the convenience store clerk, Richard Burnett. When Burnett opened the cash register drawer, Orbe shot him in the chest. As Burnett clutched his chest and struggled to remain standing, Orbe walked around the counter and removed some money from the cash register drawer. He then fled the store, taking with him the $90.65 he had taken from the cash register drawer.

Shortly thereafter, a customer discovered Burnett's body and called for emergency assistance. A police investigator arrived to find Burnett's lifeless body on the floor behind the cash register.[2] The video-

---

[1]. The facts are drawn from the Supreme Court of Virginia's decision, *Orbe v. Commonwealth*, 258 Va. 390, 394–98, 519 S.E.2d 808, 810–13 (1999).

[2]. The medical examiner who performed the autopsy on Burnett concluded that Burnett had suffered a single gunshot to his front left chest, which injured his heart, liver, and lung, and caused the bleeding that led to his death.

tape from the security camera was recovered, and still images from the tape were disseminated to law enforcement and the media. The sheriff's office received several telephone calls identifying Orbe as the person in the pictures. Yet, Orbe was not apprehended until the conclusion of a high speed chase through the streets of Richmond on January 31, 1998. During this chase Orbe drove across a median, traveled down the wrong side of a street, and accelerated through a roadblock. He was eventually captured on foot after he jumped out of his vehicle and ran down an alley.

In the search pursuant to Orbe's arrest, a partially loaded .357 magnum revolver was found tucked in the waistband of his pants. After examining the revolver and the bullet that had been removed from Burnett's chest, a forensic scientist at the Virginia Department of Criminal Justice Services concluded that the bullet had been fired from the revolver found on Orbe. The serial number of the gun matched that of a gun belonging to Orbe's stepfather Willis Branch, which had been kept in the home Branch shared with Orbe. Branch had discovered that the gun was missing in the first or second week of January 1998.

The incident at the convenience store was part of a string of criminal acts Orbe committed over the course of ten days. The facts concerning these incidents were presented to the jury during the sentencing phase of the trial to prove Orbe's future dangerousness. This evidence reflected that Orbe began his crime spree on January 21, 1998, when Lois Jones and Mark Scougal returned home to find Orbe in their bedroom. Orbe pointed the revolver at Scougal and ordered Scougal to drive him away because he was hiding from the police. While Orbe was forcing Scougal out to the car, Jones retrieved a firearm from her gun cabinet. Testimony

was conflicting as to whether Jones fired a warning shot. In any event, Orbe clearly fired his revolver twice, hitting Jones in the leg on the second shot. After Scougal refused to give him the car keys, Orbe fled from the scene.

On the same day, Orbe approached two elderly men, Charles Powell and William Bottoms, who were sitting in the front yard of Bottoms's house in Richmond. Orbe showed the men his gun and ordered them to walk to the rear of the house. Telling the men he had "nothing to lose," Orbe ordered both men to surrender their wallets and car keys. With these in hand, Orbe left in Powell's car. The shooting of Burnett occurred two and one half days later.

Thereafter, on January 30, 1998, Orbe was discovered inside a private residence in New Kent County when Karen Glenn, Patricia Tuck and another woman arrived to perform scheduled cleaning services. Orbe brandished his gun and yelled "Bitches, get down." He hit Tuck between the shoulder blades with his gun. He then ordered the three women to crawl on their stomachs to a bedroom and into a closet. He nailed a piece of plywood across the closet door, sealing the women in the closet until the homeowner returned four and one half hours later. Orbe told the women "I'm Dennis Orbe, I'm wanted for murder, and it doesn't matter what I do." He took money, checks and other valuables from the women, including the keys to Glenn's car, which he stole.

During the sentencing phase of the trial, the jury also heard evidence in mitigation of the offense. Orbe's mother and stepfather testified about his troubled childhood and his problems with alcohol abuse. A friend described a change in Orbe's behavior shortly before the January 1998 incidents. The administrator of the regional jail where Orbe had been incarcerated tes-

tified that he had received only one minor complaint about Orbe's behavior during confinement.

Orbe also presented testimony from Dr. Thomas Pasquale, a clinical psychologist who had evaluated Orbe for the purpose of assessing his future dangerousness. Dr. Pasquale testified (i) that Orbe had exhibited suicidal tendencies for at least a year prior to the January 1998 incidents, (ii) that he was depressed, in part over his perceived failure as a father and husband, (iii) that he drank heavily, and (iv) that he had an impulse control dysfunction. Dr. Pasquale also noted that Orbe's father had abandoned him at an early age, and that Orbe, who had recently located his father, may have been attempting to steal money for the purpose of visiting his father. In sum, Dr. Pasquale testified that Orbe was not a future danger in a prison setting, unless he had access to alcohol or was placed under duress while incarcerated, but that a "very dangerous, very risky" situation would result if he escaped.

## II. Procedural History

Orbe was arrested on January 31, 1998, and indicted in York County for (i) the capital murder of Richard Burnett, (ii) robbery, and (iii) two firearms offenses. The Circuit Court for York County appointed Andrew Protogyrou as lead counsel and Damian Horne as co-counsel. Following a three day trial, August 10–13, 1998, the jury found Orbe guilty of all charges and on October 27, 1998, he was sentenced to death plus sixty years in accordance with the jury verdict. Still represented by Messrs. Protogyrou and Horne, Orbe appealed his convictions and death sentence on five grounds. The Supreme Court of Virginia affirmed the convictions and the sentence on September 17, 1999. *See Orbe v. Commonwealth*, 258 Va. 390, 519 S.E.2d 808 (1999). Thereafter, with new counsel,

Orbe sought a writ of certiorari in the Supreme Court of the United States, which was denied on May 15, 2000. *See Orbe v. Virginia*, 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000).

On July 14, 2000, Orbe filed an original petition for a writ of habeas corpus in the Supreme Court of Virginia. This petition was 113 pages long, exceeding by a substantial margin the 50 page limit on original habeas petitions in capital cases. *See* Rule 5:7A(g), Va. Sup.Ct. R. Orbe's petition included a motion for leave to exceed the limit. The Supreme Court of Virginia denied the motion, ordering Orbe to file a petition in compliance with the Rule's page limitations by August 28, 2000. *See Orbe v. Warden*, No. 001708 (Va. July 27, 2000). Orbe did so, along with a motion to amend the petition to include three new claims. Orbe then filed a second motion to amend on June 20, 2001, adding one more claim and again requesting permission to exceed the page limit. The Supreme Court of Virginia denied the motions to amend and dismissed the petition on September 10, 2001. *See Orbe v. Warden*, No. 001708 (Va. September 10, 2001). Orbe's petition for rehearing was denied on November 2, 2001. *See Orbe v. Warden*, No. 001708 (Va. November 2, 2001).

The Circuit Court of York County scheduled Orbe's execution for December 13, 2001. On December 6, 2001 the execution was stayed by an Order of this Court. *See Orbe v. True*, Civil Action No. 01–1845–A (E.D.Va. December 6, 2001) (Order). Also on December 6, Orbe filed a writ of certiorari to review the habeas decision of the Supreme Court of Virginia, which was denied on February 29, 2002. *See Orbe v. Taylor*, 534 U.S. 1139, 122 S.Ct. 1089, 151 L.Ed.2d 988 (2002).

Thereafter, pursuant to the prescribed schedule,[3] Orbe filed a 286–page petition

---

**3.** *See Orbe v. True*, Civil Action No. 01–1845–A (E.D.Va. December 14, 2001) (Order).

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on May 10, 2002. The petition sets out the following grounds for relief:

I. Racial discrimination:

A. The prosecutor's decisionmaking was tainted by improper considerations of race.

B. Defense counsel failed to protect Orbe from the prosecutor's improper considerations of race.

II. Improper exclusion of venireman Conner:

A. The trial court improperly excluded Conner.

B. Defense counsel failed to challenge the exclusion at trial or on appeal.

III. Lesser included offense:

A. Orbe was deprived of his right to a first degree murder instruction.

B. Defense counsel failed to present properly the lesser included offense issue at trial and on appeal.

1. Failed to ensure that the trial court understood the state law on first degree murder.

2. Failed to clarify the evidence regarding the hammer block on the gun.

3. Failed to adduce evidence regarding modifications making the gun easier to fire.

4. Failed to cite the Constitution and federal precedent on appeal.

IV. Conflict of interest:

A. The defense expert also acted as the prosecution's expert.

B. Defense counsel failed to protect Orbe's confidences and secrets.

1. Failed to limit Dr. Pasquale's communications with the prosecutor.

2. Failed to debrief Dr. Pasquale adequately.

3. Failed to inform and consult with Orbe.

V. Orbe was not provided proper expert assistance:

A. The appointed expert did not provide appropriate assistance.

B. Defense counsel failed to ensure that Orbe had proper expert assistance.

1. Failed to rely on *Ake* with respect to the appointment of an expert.

2. Failed to ensure that Orbe had the assistance of an independent expert.

3. Failed to investigate and provide the expert accurate information about Orbe's supposed abuse of his former wife.

4. Failed to ensure that the expert had all necessary and relevant information from witnesses and documents.

5. Failed to request assistance of a psychiatrist or neuropharmacologist.

VI. Ineffective assistance of counsel:

A. Defense counsel encouraged prospective jurors to disregard mercy in their sentencing decision.

B. Defense counsel rendered ineffective assistance during the sentencing phase.

1. Failed to investigate sexual, physical and emotional abuse.

2. Failed to present evidence that Orbe may suffer from bipolar disorder.

3. Failed to obtain pertinent mental health records.

4. Failed to obtain and present evidence from family and friends.

C. Defense counsel failed to brief or argue assignment of error 16 on appeal (the antisympathy instruction).

VII. Appointment of Horne:
 A. Horne did not meet the Public Defender Commission's qualifications.
 B. Defense counsel failed to object to, inform Orbe of, or handle properly Horne's lack of qualifications.
VIII. Juror misconduct:
 A. Jurors were exposed to improper extraneous influences.
 B. Defense counsel failed to investigate and disclose juror misconduct.
IX. The death penalty in Virginia is unconstitutional.
X. Defective verdict form:
 A. Juror instructions and verdict forms were inconsistent and confusing.
 B. Defense counsel failed to ensure that the forms corresponded to the instructions and the sentencing statutes and failed to argue properly the issue at trial and on appeal.
XI. Denial of federal constitutional protection in state habeas corpus proceedings.[4]

Also pending before the Court is Orbe's renewed motion for funds for the appointment of a psychiatrist under 21 U.S.C. § 848(q)(9).

### III. Procedurally defaulted claims

#### A.

■ One set of claims presented by Orbe in his federal habeas petition was procedurally defaulted during the state court proceedings. The Supreme Court of Virginia, in ruling on Orbe's state habeas petition, found that claims I(A), II(A), III(A), IV(A), and V(A) were procedurally defaulted under the rule in *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974), because they could have been raised at trial or on direct appeal, but were not. The Supreme Court of Virginia's application of the *Slayton* procedural default rule bars consideration of these claims on federal habeas review, absent cause and actual prejudice or a miscarriage of justice. *See Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Burket v. Angelone*, 208 F.3d 172, 188–89 (4th Cir.2000).

■ For these five claims, Orbe asserts that ineffective assistance of counsel constitutes cause for the state procedural default. It is well established that attorney errors can serve as cause to excuse a default, but that the attorney's performance in this respect must be so poor as to constitute constitutionally ineffective assistance of counsel under the Sixth Amendment. *See Coleman v. Thompson*, 501 U.S. 722, 754, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Burket*, 208 F.3d at 184. The standard announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),[5] remains the test for determining whether ineffective assistance of counsel rises to the level of a constitutional violation. *See Terry Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Arguing that his counsel failed to meet this standard, and that he suffered actual prejudice as a result, Orbe requests consideration of the merits of these procedurally defaulted claims.

Orbe also asserts independent ineffective assistance of counsel claims based on

---

4. Claim XI was added to Orbe's federal habeas petition by a September 3, 2002 notice of addition.

5. To establish ineffective assistance under *Strickland*, a defendant must show (i) "that counsel's representation fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, and (ii) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052.

the same fact situations. In claims I(B), II(B), III(B), IV(B), and V(B) Orbe argues that his counsel's failures themselves are independent bases for relief. These claims are discussed individually below. Thus the same failures and omissions of defense counsel are used in two distinct ways by Orbe: First, he relies on them as cause to excuse the default of the underlying substantive claims, as in claim I(A), and second, he asserts that they are independent grounds for relief in their own right, as in claim I(B).

■ At the outset, Orbe contends that different standards of review are applicable to the consideration of ineffective assistance of counsel depending on whether the ineffective assistance is offered as cause for default, as in claim I(A), or as an independent basis for relief, as in claim I(B). When ineffective assistance claims are offered as independent bases for relief and were adjudicated on the merits in state court proceedings, a federal court must apply the deferential review standard established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), as codified at 28 U.S.C. § 2254(d). *See Terry Williams,* 529 U.S. at 402–03, 411, 120 S.Ct. 1495; *Hunt v. Lee,* 291 F.3d 284, 289–90 (4th Cir.2002). Yet, seeking to avoid this deferential review standard, Orbe argues that the cause-for-default ineffective assistance determination is reviewable by a federal court *de novo.* This contention, although ultimately without merit, bears some investigation.

■ Orbe correctly acknowledges that he must have exhausted his independent ineffective assistance of counsel claims in order to raise cause-for-default ineffective assistance claims on federal habeas. *See Edwards v. Carpenter,* 529 U.S. 446, 451–452, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). Orbe also correctly acknowledges that, in order to show adequate cause for the default, he must show that counsel's performance was so inadequate as to constitute a violation of the Sixth Amendment under *Strickland. See id.* at 451, 120 S.Ct. 1587. Yet, Orbe asserts that he need not additionally show, under § 2254(d), that the state adjudication of the ineffective assistance claim was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(1) & (2).[6] Instead, according to Orbe, a federal court considering a cause-for-default claim should not give deference to the state's adjudication of an independent ineffective assistance claim, but must decide *de novo* whether the ineffective performance of counsel was constitutionally deficient under *Strickland,* thereby establishing cause for the procedural default.[7]

---

6. Under § 2254(d), federal courts "have only limited powers of judicial review" when entertaining collateral attacks on state convictions. *See Bates v. Lee,* 308 F.3d 411, 417 (4th Cir.2002). A state decision is "contrary to clearly established federal law" if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from [its] precedent." *Id.* (citing *Terry Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495). A state court decision involves an "unreasonable application of federal law" if the

state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* (citing *Terry Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495), or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Id.* (citing *Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000)).

7. Orbe contends that applying § 2254(d) deference in this instance would "preclude a federal court from finding cause—even if counsel's performance was patently deficient

In support of this contention, Orbe asserts that "[c]ause and prejudice is purely a matter of federal procedural law; it is not a question the state court could (or did) decide." In further support, Orbe cites pre-AEDPA precedent which makes clear that the "cause and prejudice" standard for overcoming procedural default is a federal question. *See Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) ("[T]he question of when and how defaults in compliance with state procedural rules can preclude our consideration of a federal question is itself a federal question."); *Murray v. Carrier*, 477 U.S. 478, 489, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (describing "the question of cause" as "a question of federal law").

Orbe's arguments are unpersuasive. Merely showing that cause for default is a federal question is insufficient to avoid § 2254(d)'s deferential review standard. All claims which may be considered on federal habeas review raise a federal question. *See* § 2254(a) (The federal court "shall entertain an application for a writ of habeas corpus . . . only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."). Therefore, the scope of § 2254(d)'s deferential review standard cannot turn on whether or not a federal question is present. Nor can Orbe evade the deferential standard of § 2254(d) by arguing that the cause-for-default question is outside the scope of § 2254(d) because it is a federal *procedural* question. The statute requires deference with respect to *"any claim"* earlier adjudicated on the merits in state court, regardless of the procedural posture of the claim on federal habeas review.[8] Thus, § 2254(d) requires deference to an earlier state adjudication of a claim on the merits without regard to the posture of that claim on *federal* review. Put differently, § 2254(d)'s plain language requires a federal court on habeas review to apply that provision's deferential review standard to a state merits adjudication of an ineffective assistance claim whether that claim is asserted as cause for default or as an independent, substantive claim for relief.[9]

---

under *Strickland*—unless the state court's adjudication of the ineffective assistance claim also was contrary to or involved unreasonable application of *Strickland.*" Yet, if counsel's performance were *patently* deficient under *Strickland*, surely a finding by the state to the contrary would be "contrary to" or involve an "unreasonable application" of *Strickland*, in which case the additional hurdle imposed by § 2254(d) would be no hurdle at all. More interesting is the situation where counsel's performance is *not* patently deficient under *Strickland*, but instead is in that region where courts might reasonably disagree as to its sufficiency under *Strickland*. In these instances, Orbe's contention becomes material; whether or not the federal court must defer to the state court's adjudication of the claim might affect the outcome of the federal court's analysis.

8. *See* § 2254(d) ( "[A writ of habeas] shall not be granted *with respect to any claim* that was adjudicated on the merits in state court unless the adjudication of the claim [was an unreasonable application of or contrary to federal law].") (emphasis added).

9. Orbe further contends that § 2254(d), by its terms, should not apply in the cause for default analysis because § 2254(d) applies only to *"granting"* habeas relief, whereas the cause-for-default determination merely involves a decision whether to reach the merits of an otherwise defaulted claim, a determination which itself does not involve *"granting"* relief. This argument misreads § 2254(d) and ignores the plain meaning of the statute's broad language. Although a finding of cause-for-default does not itself grant relief, it is, of course, an integral part of a decision to grant relief on the underlying defaulted claim. Again it is clear that § 2254(d) requires federal courts to give deference with respect to *any* claim adjudicated on the merits by the state, not merely to claims the federal court considers on the merits.

Moreover, the case law regarding exhaustion of claims clearly refutes Orbe's contention that cause-for-default ineffective assistance claims must be considered independently of substantive ineffective assistance claims adjudicated by the state. The very paragraph in *Carrier* on which Orbe relies to argue that the cause-for-default determination is an independent federal question makes clear that, as far as exhaustion of claims is concerned, no distinction is made between the two types of ineffective assistance claims. Specifically, *Carrier* makes clear that federal courts may decide the cause-for-default question without regard to exhaustion of a claim in state proceedings only if the federal court can adjudicate the question "without deciding an independent and unexhausted constitutional claim on the merits." *Carrier*, 477 U.S. at 489, 106 S.Ct. 2639. In other words, the "principle of comity that underlies the exhaustion doctrine" applies "whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief." *Id.* And, more recently, *Edwards* reaffirmed that ineffective assistance "must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *See Edwards*, 529 U.S. at 452, 120 S.Ct. 1587. The same comity principle underlies the deference to state adjudication required by § 2254(d). *See Terry Williams*, 529 U.S. at 386, 404, 120 S.Ct. 1495. Therefore, it is logical that the same degree of deference must be accorded to prior state adjudications of ineffective assistance claims, regardless of the procedural posture of the ineffective assistance claims on federal habeas.

Finally, Orbe contends, unpersuasively, that cause-for-default ineffective assistance claims must be determined by a standard different from § 2254(d) to preserve the "robust function of cause and prejudice." In support of this contention, Orbe points out that if identical standards were to apply to both types of ineffective assistance claims, then a petitioner able to use ineffective assistance to show cause for default would always also have an avenue for relief through a straightforward ineffective assistance claim. According to Orbe, this leaves ineffective assistance as cause for default with no independent role or function. While this is true in certain circumstances, it does not compel the conclusion that a different standard of review ought to apply to the two different types of ineffective assistance claims. To the contrary, the identical *Strickland* standard has long been applied to both types of claims. *See Edwards*, 529 U.S. at 451, 120 S.Ct. 1587 ("[I]neffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim."); *see also Carrier*, 477 U.S. at 488, 106 S.Ct. 2639. Section 2254(d) changed the standard for federal habeas review of state court merits determinations of ineffective assistance claims under *Strickland,* but the statute did not alter the sensible, existing rule that a consistent standard applies to ineffective assistance claims whether asserted as cause for default or as an independent substantive claim for habeas relief. The purpose of § 2254(d) was to change the standard of review on federal habeas for all claims adjudicated on the merits in state court, not, as Orbe would have it, to make cause-for-default ineffective assistance claims more "robust." Section 2254(d)'s deferential review standard was intended by Congress to "curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law," *Terry Williams*, 529 U.S. at 386, 404, 120 S.Ct. 1495. Orbe offers no persuasive reason to conclude that this standard should not apply to federal habeas review of state court rulings on ineffective assistance of counsel claims whether the claims are asserted as

cause to excuse default or as a substantive basis for relief.[10]

In the end, then, Orbe's ineffective assistance claims asserted as cause to excuse default were decided on the merits by the Supreme Court of Virginia, and thus must be reviewed deferentially pursuant to § 2254(d). And, as discussed *infra*, Orbe has failed in each instance to show, as required by § 2254(d), that the Supreme Court of Virginia's application of the *Strickland* test to his ineffective assistance claims was either "contrary to, or an unreasonable application of" federal law, or that it was "based on an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(1) & (2).

Therefore, Orbe cannot rely on these claims to excuse the default, and it follows that claims I(A), II(A), III(A), IV(A) and V(A) are not cognizable on federal habeas, having been previously denied on an adequate, independent state procedural ground.[11]

## B.

■ A second set of claims offered by Orbe in his federal habeas petition, claims VII, VIII, IX, and X, are properly found to be procedurally defaulted because they were not "presented to the Supreme Court of Virginia on direct appeal nor in state habeas corpus proceedings." *Gray v. Netherland*, 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996).[12] For his

10. Indeed, adopting Orbe's dual standard approach would add yet another layer of complexity to the already baroque federal habeas procedures. *See Edwards*, 529 U.S. at 454, 120 S.Ct. 1587 (Breyer, J. concurring) (lamenting the complexity of habeas corpus jurisprudence).

11. The procedural status of claim III(A) is somewhat more complicated. In claim III(A), Orbe argues that he was unconstitutionally deprived of his right to a lesser included offense instruction on first degree murder. On direct appeal, the Supreme Court of Virginia addressed this same claim, although the federal law basis for the claim was not explicitly cited. Specifically, the Supreme Court of Virginia held that Orbe was not entitled to the lesser included offense instruction owing to the lack of evidence supporting such an instruction. *See Orbe v. Commonwealth*, 258 Va. at 398–99, 519 S.E.2d 808. Subsequently, in ruling on Orbe's state habeas petition, the Supreme Court of Virginia found the federal law aspect of this claim barred under the rule in *Slayton* because the federal basis for the claim could have been raised on direct appeal but was not. *See Orbe v. Warden*, No. 001708 at 3 (Va. September 10, 2001).

Orbe now argues that his federal claim III(A) was, in fact, presented to the state court on direct appeal, but was never addressed on the merits, and therefore is reviewable *de novo*. To reach this result, Orbe must argue, contradictorily, that his federal claim was

fairly presented through the language used on direct appeal and his state case citations which relied on federal law, but that the rejection of this claim on the merits did not also include rejection of the federal law claim on the merits. Orbe cannot have it both ways; either his federal law claim was presented to the state court, in which case it was rejected on the merits owing to the lack of evidentiary support, or, it was not presented to the state court, it which case it was properly found defaulted. In neither case is claim III(A) eligible for *de novo* federal habeas review on the merits.

Even assuming that Orbe's federal claim was presented to the Supreme Court of Virginia on direct appeal and denied on the merits, it would be reviewable before this court only under § 2254(d)'s deferential standard. Given the lack of merit of the lesser included offense instruction claim, *see infra* at pp. 770–72, the Supreme Court of Virginia's decision on the merits must be upheld as reasonable and not contrary to the evidence.

12. As *Gray* explains, such claims are barred as procedurally defaulted even though they are exhausted at the state level. *Gray*, 518 U.S. at 162, 116 S.Ct. 2074. The claims, which were never presented to the state court, are exhausted because state remedies are not available at the time of the federal habeas petition owing to state procedural default rules. *Id.; see* Va.Code § 8.01–654(B)(2) (barring successive habeas peti-

part, Orbe contends that these claims were presented to the Virginia court because they were included initially in an over-length state habeas petition and then in motions to amend the shortened petition. Because the Supreme Court of Virginia did not address these claims on the merits, if "properly presented" these claims would be eligible for *de novo* review on the merits in federal habeas proceedings. *See Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir.1999). Yet, the procedural history of these claims and the relevant federal precedent make clear that these claims were not "properly presented" to the state court.

Orbe initially filed a 113–page state habeas petition. State habeas petitions in death penalty cases in Virginia are limited to 50 pages, unless permission for a longer petition is granted by a justice of the court. *See* Rule 5:7A(g), Va. Sup.Ct. R. The Supreme Court of Virginia denied Orbe's accompanying motion for permission to file a longer petition, and directed him to file a 50–page petition. Orbe filed a shorter petition as directed. On the same day, Orbe filed a motion to amend his petition "by leave of court" under Rule 1:8, Va. Sup.Ct. R., and also requested permission to exceed the 50–page limit. Orbe thereby sought to reintroduce claim VII, which had been omitted from the shortened petition, and two new claims, claims VIII and IX. A second motion for amendment added a proposed claim X. Orbe's motions to amend were opposed by the Warden, who contended that granting the request for leave to amend under Rule 1:8 would simply circumvent the Rule 5:7A(g) page limit. The Supreme Court of Virginia denied Orbe's motions to amend without comment, and did not address the merits of any of the claims proffered by

Orbe in his motions to amend. *See Orbe v. Warden*, No. 001708 (Va. September 10, 2001).

In order to exhaust state remedies, as required by § 2254(b)(1)(A) & (c), it is well established that petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," but they need not "invoke extraordinary measures" which are "alternatives to the standard review process." *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). One complete round of the established appellate review process is not only sufficient for exhaustion, it is necessary. Thus, "we ask not only whether [petitioner] has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts." *Id.* at 849, 119 S.Ct. 1728. In other words, "where the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons therefore'" the requirement of "fair presentation" is not met. *Castille v. Peoples*, 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989). In sum, the fact that a state court has been physically presented with the claims in a pleading or motion does not necessarily mean that those claims were properly presented; the petitioner must avail himself of the "established appellate review process," and not rely solely on "extraordinary" procedures that require "special and important reasons" before the state court will reach the merits of the claims. *See O'Sullivan*, 526 U.S. at 844,

---

tions). However, the same procedural bar that exhausts these claims also renders them unavailable for federal habeas review because

they have been found procedurally defaulted by an adequate and independent state-law ground. *Id.*

119 S.Ct. 1728; *Castille*, 489 U.S. at 351, 109 S.Ct. 1056.

Two cases help to illustrate the application of these principles. The Supreme Court in *Castille* held that filing a new claim in a post-conviction petition for allocatur with the Pennsylvania Supreme Court was not a "fair presentation" of that claim to the state court. *Castille*, 489 U.S. at 351, 109 S.Ct. 1056. By contrast, the Fourth Circuit has held that a new claim presented in a motion to reopen a Maryland post-conviction proceeding was properly presented, even though the Maryland court had discretion to deny the motion, because "Maryland law plainly established a right to raise new claims in a motion to reopen a previous PCR [post-conviction relief] proceeding." *See Baker v. Corcoran*, 220 F.3d 276, 291 (4th Cir.2000). The difference between these cases is whether the avenue through which the claim is presented is part of the "established appellate review process." *See O'Sullivan*, 526 U.S. at 844, 119 S.Ct. 1728. The post-conviction petition for allocatur is not an "established appellate review process" in Pennsylvania, whereas a motion to reopen a previous PCR proceeding is such a process in Maryland. *See Baker*, 220 F.3d at 291.

Orbe contends that his motion for leave to amend and leave to exceed the page limit was not an extraordinary measure in the manner of the petition for allocatur in *Castille*, but rather an unexceptional mechanism for the presentation of new claims, similar to the motion to reopen the PCR proceeding in *Baker*. He argues that motions to amend under Rule 1:8 are routine, and "shall be liberally granted in furtherance of the ends of justice," Rule 1:8, Va. Sup.Ct. R. Moreover, he argues that the 50–page limit established by Rule 5:7A(g) is discretionary, and serves administrative convenience only, because it can be waived by a single justice. *See* Rule 5:7A(g), Va.

Sup.Ct. R. ("Except by permission of a justice of this Court...."). He asserts that "nothing in Virginia law prohibited the state court" from granting his motion to amend his petition and exceed the page limit. Therefore, he contends that the claims offered to the state court in his motions to amend were fairly presented to that court.

Orbe's argument misstates the standard established by *O'Sullivan, Baker,* and *Castille*. In determining whether a claim was "fairly presented," it is not enough to establish that the state court was not legally barred from considering the merits of the claim; instead, the relevant inquiry focuses on whether the claim was presented according to the "statutorily prescribed mechanism for doing so," *Baker*, 220 F.3d at 291, that is, the "established appellate review process," *O'Sullivan*, 526 U.S. at 844, 119 S.Ct. 1728, or whether the petitioner relied on "extraordinary remedies," *id.*, that is, a "procedural context" in which the merits of the claim will not be considered absent "special and important reasons," *Castille*, 489 U.S. at 351, 109 S.Ct. 1056.

Two considerations compel the conclusion that Orbe's claims, which were presented in violation of Rule 5:7A(g)'s page limit, were not fairly presented. First, although motions to amend under Rule 1:8 may be routine, ordinary, and liberally granted, motions to exceed the page limit imposed by Rule 5:7A(g) are precisely the kind of extraordinary measure which does not constitute "fair presentation." Indeed, the page limit appears to be a routinely-enforced rule, not a mere discretionary guideline. Consistent with this, Orbe offers only one Virginia state habeas case in which permission to exceed the page limit was granted. *See Bramblett v. Warden*, No. 992912 (Va. February 10, 2000). This single example hardly suggests that per-

mission to exceed the page limit is routine and ordinary. Even more telling is the fact that a violation of similar Virginia Rules establishing page limits for petitions for direct appeal and opening briefs results in procedural default, even though these Rules can also be waived by the discretion of a single justice. *See Mueller v. Angelone*, 181 F.3d 557, 581–82 (4th Cir.1999) (discussing Rule 5:17(c)'s 35–page limit for petitions for direct appeal); *Weeks,* 176 F.3d at 270–71 (discussing Rule 5:26(a)'s 50–page limit for opening briefs on direct appeal). Orbe offers no persuasive grounds for distinguishing between the page limits imposed on briefs on direct appeal and those imposed on state habeas petitions. Indeed, it would be incongruous to hold that, while violation of the former results in procedural default at the state court level, violation of the latter nonetheless constitutes fair presentation of the claims to the state court, thus barring a finding of procedural default by the federal habeas court. In other words, since comity requires giving proper weight to state procedural rules, just as failure to obey page limit rules on direct appeal results in procedural default at the state level, so too must the failure to present claims within the prescribed page limit during state habeas proceedings likewise preclude federal review of those claims on the merits.

Second, both the majority and the dissent in *O'Sullivan* recognize that federal exhaustion and procedural default rules must not allow a petitioner to circumvent a state opportunity to review federal claims by presenting claims at the state level in a manner which violates a state procedural rule. *See O'Sullivan,* 526 U.S. at 848, 119 S.Ct. 1728; *id.* at 853–54, 119 S.Ct. 1728 (Stevens, J., dissenting). The comity interests underlying these rules would be ill-served if, for example, prisoners could satisfy federal habeas exhaustion requirements simply by letting the time run on their state remedies and then presenting their claims in federal court, thereby providing the state courts no opportunity to address these claims. *Id.* at 853–54, 119 S.Ct. 1728. In this case, Orbe never presented claims VII, VIII, IX and X to the state court in compliance with Rule 5:7A(g)'s page limit. Thus, barring an extraordinary decision to disregard its page limit rule, the state court had no opportunity to reach them. If these actions constitute fair presentation, state page limit rules could be strategically manipulated by petitioners in order to preclude state courts from ruling on selected claims, while nonetheless preserving them for federal habeas review. Comity therefore requires barring these four claims from federal habeas merits review.

Finally, Orbe argues that the 50–page limit physically prevented him from bringing all of his viable constitutional claims before the state court because it was impossible to "cram" them into the petition and still argue them with the required thoroughness. He argues that because of this impediment to bringing his claims, "circumstances exist that render [the state corrective] process ineffective to protect the rights of the applicant," making proper presentment to the state courts unnecessary. *See* 28 U.S.C. § 2254(b)(1)(B)(ii). Yet, the Fourth Circuit in *Weeks* flatly rejected the argument that page limits physically prevent petitioners from raising claims, noting that "[t]he fifty-page limit [for briefs on direct appeal] merely limited the manner in which [petitioner] could present his arguments; it did not wholly prevent him from presenting them." *Weeks,* 176 F.3d at 271. According to the unanimous panel decision in *Weeks,* "[w]hile the page limitation may have led [petitioner's] counsel to make certain strategic choices as to which arguments to include and which to omit, the page limitation is reasonable." *Id.* at 272. Again, Orbe offers no ground to distinguish between page limits for briefs on direct ap-

peal, and those imposed on state habeas petitions. The page limit established for Virginia state habeas proceedings does not render the state process "ineffective to protect the rights of the applicant." *See* 28 U.S.C. § 2254(b)(1)(B)(ii). Orbe is therefore still bound by the federal habeas exhaustion rule codified at § 2254(b)(1)(A).

In sum, although claims VII, VIII, IX and X were included in Orbe's motions to amend his state habeas petition, these claims were never presented to the Supreme Court of Virginia in compliance with the page limit established by Rule 5:7A(g), Va. Sup.Ct. R. Barring "special and important reasons" to grant Orbe leave to amend his petition and circumvent the page limit rule, the Supreme Court of Virginia could not, and did not, reach the merits of these claims. Therefore, according to *Castille*, these claims were not fairly presented to the state court. *See Castille*, 489 U.S. at 351, 109 S.Ct. 1056. It follows, then, under the rule in *Gray*, that these claims are procedurally defaulted because they were not presented to the state court on direct appeal or on habeas review. *See Gray*, 518 U.S. at 162, 116 S.Ct. 2074.

### IV. Merits Review

#### A. Claim I(B): Defense Counsel Unreasonably Failed to Address the Prosecutor's Racial Discrimination

■■ Orbe claims that his original trial counsel unreasonably failed to protect Orbe from the prosecutor's improper consideration of race. In this regard, Orbe contends that the prosecutor did, in fact, consider race as part of her decisions (i) to charge Orbe with capital murder and (ii) to refuse his plea offer. He further contends that his counsel was or should have been aware of the prosecutor's improper consideration of race, and therefore provided ineffective assistance by not confronting the prosecutor, moving for her recusal, moving to quash the indictment, or consulting Orbe about the prosecutor's consideration of race. The Supreme Court of Virginia addressed the merits of this claim on state habeas review, finding that the claim failed "for lack of proof that there was racial discrimination in the prosecution of the case." *See Orbe v. Warden*, No. 001708 at 2 (Va. September 10, 2001). Thus, relief may be granted on the basis of this claim only if the Supreme Court of Virginia's ruling was "contrary to, or an unreasonable application of, clearly established Federal law." *See* 28 U.S.C. § 2254(d).[13]

■ To show ineffective assistance of counsel sufficient to create a violation of the Sixth Amendment, Orbe must show that his counsel (i) failed to offer "reasonably effective assistance," and (ii) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

---

**13.** Orbe argues that the Supreme Court of Virginia failed to address the merits of this ineffective assistance of counsel claim. Although the Supreme Court of Virginia did not explicitly discuss the application of *Strickland* to the race discrimination claim, it squarely addressed the merits of the underlying allegations of race discrimination. After finding the underlying claim meritless, the Supreme Court of Virginia did not proceed to address the adequacy of counsel's performance or its effect on the outcome of the trial. Yet, Orbe, seizing on the failure to address the *Strickland* factors with respect to this claim, contends that the Supreme Court of Virginia's treatment of the claim was contrary to or involved an unreasonable application of clearly established federal law. Orbe therefore seeks *de novo* review of this claim. This argument is inconsequential. Although the Supreme Court of Virginia did not explicitly mention *Strickland* in its adjudication of this claim, its ruling was not contrary to or an unreasonable application of the legal principles taught in *Strickland*. In any event, as the discussion *infra* reflects, the race discrimination claim fails whether it is reviewed *de novo* or deferentially pursuant to § 2254(d).

different." *See Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* analysis "of necessity requires a case-by-case examination of the evidence." *See Terry Williams,* 529 U.S. at 391, 120 S.Ct. 1495. When ineffective assistance claims are based on the failure to raise, develop, or properly present an underlying claim, an examination of the merits of the underlying claim will frequently be dispositive of the ineffective assistance claim. If the underlying claim is meritless, counsel's failure to pursue it can be neither unreasonable nor prejudicial, and no further inquiry is necessary. *See, e.g., Wright v. Angelone,* 151 F.3d 151, 161 (4th Cir.1998) (summarily rejecting ineffective assistance claim based on the failure to challenge the jurisdiction of the circuit court because the jurisdictional claim was meritless). Therefore, analysis properly begins with a consideration of the merits of the race discrimination claim despite its defaulted status.[14]

The relevant facts concerning the race discrimination claim are as follows: Six months prior to Orbe's trial, a York County jury verdict resulted in Daryl Atkins receiving a death sentence for capital murder. Prior to Orbe's trial, his counsel approached the prosecutor to discuss plea negotiations. According to trial counsel's affidavit, the prosecutor refused to consider any agreement, and told him that "she could not agree to give a white man (Mr. Orbe) a life sentence when she had just asked for and obtained a death sentence for a black man (Daryl Atkins)." The prosecutor avers in her affidavit that she rejected the plea offer on the merits, because she considered Orbe's case "clearly a capital murder." She noted that the crime was "brutal" and the evidence of his guilt was "overwhelming." She also noted that the murder was part of a "crime spree, including robbery, another shooting, abductions and a high-speed chase with the police in Richmond." Finally, she states that she did not "see any distinction to be drawn between [Orbe's and Atkins's] cases in terms of the seriousness of the offenses or the evidence of the future dangerousness of the defendants." She acknowledges making a statement regarding the need to be consistent between the two defendants regarding capital murder charges. Specifically, the prosecutor avers that "only as an afterthought, I remarked that I could imagine that if there was [sic] such a plea agreement in Orbe's case, someone might allege that he received special treatment only because he was white." On these facts, Orbe argues that the prosecutor impermissibly allowed race to play a part in her decisions regarding charging and plea negotiations, in violation of Orbe's equal protection rights.

The legal principles that govern this claim are well-established. Decisions to prosecute "may not be based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Likewise, race and religion "may play no part in [a prosecutor's] charging decision." *Bordenkircher v. Hayes,* 434 U.S. 357, 364–65, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). However, the cases discussing selective prosecution claims make clear that prosecutors are given broad discretion in making prosecutorial decisions, and that

---

14. A quirk of current habeas law allows defendants to resurrect defaulted claims in this manner for reconsideration through an ineffective assistance of counsel claim. *See Fitzgerald v. Thompson,* 943 F.2d 463, 469 (4th Cir.1991) (noting that "[a]ttempts by petitioners to transform claims whose underlying merits have been defaulted into questions of ineffective assistance of counsel require analysis under the more stringent *Strickland* standard."). Orbe has done precisely this for all of his defaulted claims.

courts should be "hesitant" to examine the decision to prosecute. *Wayte v. United States,* 470 U.S. 598, 607–08, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). It is equally clear that "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480 (citation omitted). Orbe has presented no such clear evidence of racial discrimination.

As an initial matter, the prosecutor's statement simply cannot bear the weight Orbe places upon it. According to the prosecutor's affidavit, the statement came as an afterthought, after she had already rejected the life sentence plea on the merits because she viewed the incident as "clearly a capital murder." Thus, this record does not contain the requisite "clear evidence" that impermissible race considerations infected the prosecutor's decisions. At best, the record reflects that the prosecutor's charging decisions and plea decisions were properly made on the merits and that she was conscious of race, but only to the extent that she had resolved not to let race affect her charging decisions.[15]

Nor has Orbe demonstrated that the proffered legitimate reasons for the prosecutor's refusal to negotiate a plea were pretextual.[16] Nothing in the record contradicts the prosecutor's assertion that her decision to treat the cases similarly was a result of her conclusion that they were both clearly capital murder cases and that justice required that like cases should be treated alike. At most, Orbe suggests that Atkins's crime may have been more serious than Orbe's, and that Atkins had greater potential future dangerousness than Orbe.[17] Yet, this comparison does not, by itself, prove that the prosecutor wrongly refused a plea to a life sentence in Orbe's case. Even assuming, *arguendo,* that Orbe's crime was less serious than the Atkins crime, this does not contradict the prosecutor's judgment that both crimes warranted a death sentence. Nor does it show that the prosecutor acted unreasonably in treating the cases alike.

Orbe also argues that his case was particularly appropriate for a plea, because he lacked prior convictions and because a jury could reasonably conclude that the shooting was accidental. Yet, the record factually refutes this argument; Orbe's extensive and violent crime spree at the time of the murder negates the absence of prior convictions, and, as discussed *infra* at pp. 771–72, the evidence of accidental firing is nonexistent. Orbe further argues that a plea leading to a life sentence would have provided closure and punishment while sparing the state the costs of death penalty litigation and appeal. Of course, the same could be said about any death penalty case. In sum, there is simply no persuasive showing that Orbe's case was especially appropriate for a plea to less than

---

**15.** Orbe's counsel, the only witness to the prosecutor's statement, confirms her affidavit regarding the timing of the statement, and, in a second affidavit, makes clear that he did not think at the time that the prosecutor's statement was "racially motivated."

**16.** Because race "may play no role" in prosecutorial decisions, *see Bordenkircher v. Hayes,* 434 U.S. at 364–365, 98 S.Ct. 663, Orbe need not show that the proffered legitimate reasons were pretextual, provided that he can establish that the prosecutorial decision was, in part, "motivated by a discriminatory purpose," *see Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480. However, given the minimal direct evidence of discriminatory motivation, Orbe attempts to support his claim by attacking the legitimate reasons offered by the prosecutor.

**17.** Unlike Orbe, Atkins had a lengthy criminal record, including 21 felonies, had recruited another person as a participant in the crime, had abducted the victim, and had fired eight shots, three of which were lethal.

capital murder, and therefore there is no showing that the prosecutor's explanations for her decisions were pretextual.

Orbe has alleged an odd sort of reverse discrimination: He does not contend that he was treated differently from Atkins on account of their different races, but that he was treated the same as Atkins, when he should not have been, because their races differed. He accuses the prosecutor not of discriminatory motives herself, but rather of improperly considering race out of fear that she would be viewed as racially discriminatory.[18] Although such defensive reverse discrimination is not implausible and, if established, would constitute an impermissibly race-motivated prosecutorial decision, Orbe has not produced any persuasive evidence that this prosecutor impermissibly used race as a factor in charging and plea negotiation decisions. Simply put, Orbe has not provided the "clear evidence" of prosecutorial bias required by *Armstrong* to overcome the presumption that the prosecutor did not violate Orbe's right to equal protection of the laws. 517 U.S. at 465, 116 S.Ct. 1480. Because Orbe's underlying race discrimination claim is without merit, he cannot show that his counsel's failure to pursue such a claim was unreasonable or prejudicial under *Strickland.* Therefore, the Supreme Court of Virginia's determination that this claim failed for lack of evidence of race discrimination was not contrary to, nor an unreasonable application of, federal law under § 2254(d), and Orbe's claim on this ground must therefore be dismissed.

### B. Claim II(B): Counsel Unreasonably Failed to Object to Venireman Conner's Improper Exclusion

Orbe claims ineffective assistance of counsel based on his counsel's failure to object, either at trial or on appeal, to the trial judge's allegedly improper exclusion of potential juror Velma Conner. The Supreme Court of Virginia considered this claim on state habeas review and found that Orbe had failed to show ineffective assistance under *Strickland. See Orbe v. Warden,* No. 001708 at 2–3 (Va. September 10, 2001); *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. Thus, review of this claim must be conducted under the deferential standard of § 2254(d), and relief may not be granted unless this determination by the Supreme Court of Virginia was contrary to or an unreasonable application of federal law.

The trial judge discretionarily excused Velma Conner after apparently concluding that Conner's own doubts about her ability to serve as a juror in a capital case would significantly impair her ability to serve as an effective and impartial juror in the case. The pertinent voir dire colloquy[19] reflects

---

18. Orbe links this fear to the prosecutor's bid for re-election a year hence.

19. These portions of the transcript read as follows:

> THE COURT: Mrs. Conner, do you have an opinion that would prevent you from convicting someone of an offense that is punishable by death?
> VENIREMAN CONNER: I didn't think so at the time, that death would not be a problem. But when I got—once I got the subpoena, it is a problem for me.
> THE COURT: Okay, I understand that.
> VENIREMAN CONNER: I have to be honest with you.

> THE COURT: I want you to be honest with me.
> And you feel that you just could not impose the death penalty if you found the defendant guilty?
> VENIREMAN CONNER: The evidence would have to be very strong for me to do that.
>
> \* \* \* \* \* \*
>
> THE COURT: Ms. Conner, would you feel better if you were relieved of the duty of having to sit in judgment of somebody that you might have to impose the penalty?
> VENIREMAN CONNER: I think so far as the death penalty, yes.

that when asked "[D]o you have an opinion that would prevent you from convicting someone of an offense that is punishable by death," Conner responded "it is a problem for me." She also agreed that she would "feel better" if she were relieved of the duty of having to sit in judgment on a death penalty case. On the other hand, Conner did not state that she "could not impose" the death penalty, only that "the evidence would have to be very strong." On the basis of these answers, the trial judge excluded this juror.

Analysis of the merits of a potential juror's exclusion must begin with the recognition that the Sixth and Fourteenth Amendments "guarantee[ ] a defendant on trial for his life the right to an impartial jury." Yeatts v. Angelone, 166 F.3d 255, 265 (4th Cir.1999) (citing Morgan v. Illinois, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). Therefore, when a juror's views on the death penalty are absolute, in one direction or another, exclusion is required. Any juror who would "in no case vote for capital punishment, regardless of his or her instructions" and any juror who would "automatically vote for the death penalty in every case" must be removed. Id. Beyond these automatic decisionmakers for whom exclusion is required, trial judges may exclude jurors whose personal opinions would conflict with their duties as a death penalty juror. In this regard, "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. (citing Morgan). At the other end of the scale, a

trial judge may not exclude a prospective juror "simply because he expresses some reservations about imposing the death penalty in any case." United States v. Tipton, 90 F.3d 861, 879–80 (4th Cir.1996) (citing Witherspoon v. Illinois, 391 U.S. 510, 520–23, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). Exclusion of jurors who simply express qualms or hesitation results in a jury which is not impartial, but rather one "uncommonly willing to condemn a man to die." Witherspoon, 391 U.S. at 521, 88 S.Ct. 1770. The determination as to whether a potential juror's reservations would "substantially impair the performance of his duties" or whether they are mere qualms is a matter of discretion for the trial judge and is reviewed with deference. Tipton, 90 F.3d at 880.

Conner candidly admitted that the death penalty "is a problem for me." This problem apparently was not absolute; she indicated that she "could impose the death penalty" if the evidence was "very strong." Thus, whether Conner's exclusion was proper is determined by applying the "substantially impair" standard found in Morgan and Yeatts. In this respect, Orbe contends that Conner's reservations concerning the death penalty were the sort of mere qualms that do not properly justify the exclusion of a juror. In support, he points out (i) that Conner does not elaborate on the nature of her "problem" with the death penalty, which apparently arose after the subpoena, (ii) that her requirement that the evidence be "very strong" does not conflict with the proper "beyond a reasonable doubt" standard, and (iii) that many citizens, feeling the heavy burden of service on a death penalty jury, would "feel better" if they were excused. Thus, Orbe argues Conner was improperly ex-

---

THE COURT: All right. We're going to— we're going to honor your thoughts and your conscience, and we're going to find that you could not stand without bias or partiality because of your beliefs. And that's no—that's no discredit to you. Thank you.

cluded and Orbe's counsel unreasonably failed to raise the issue at trial or on direct appeal.

This argument, while not without some force, is ultimately unconvincing. Conner plainly had a "problem" with the death penalty and did not wish to serve as a juror in the case. Although the nature of her "problem" was not probed, it is fair to say there was more than a little ambiguity about her willingness or ability to impose the death penalty in an appropriate case. In these circumstances, determinations of the trial judge, "who had the benefit of first-hand exposure to voir dire" are reviewed "with discretion," and where responses reveal "some ambiguity about the willingness or ability to impose the death penalty, we presume the correctness of the trial court's decision." *Truesdale v. Moore*, 142 F.3d 749, 757 (4th Cir.1998). Particularly instructive here is *Tipton*, where the Fourth Circuit found a potential juror's inconclusive and vaguely expressed opposition to the death penalty sufficient to justify exclusion. *See Tipton*, 90 F.3d at 879–81. In that case, the potential juror stated that she was "not sure at this time if [she] could give the death penalty," and when asked whether her personal opinion would "substantially impair [her] service as a juror," she responded "I hope not," and "It might." *Id.* at 880. Later, however, she indicated that she could "imagine cases where she could contemplate imposing the death penalty," and when asked if her personal opinion would

get in the way in those cases she responded "No." *Id.*

Similar to the potential juror in *Tipton*, Conner gave ambiguous and arguably contradictory indications of her ability to impose the death penalty. What is clear is that she had a problem with the death penalty and did not wish to sit on the case. Conner's statement that she could only impose the death penalty given "very strong" evidence gives rise to a valid concern that, in light of her problem with the death penalty, she would have difficulty following the trial court's instructions in the case. In these circumstances, deference is appropriately accorded to the trial judge's determination regarding the true depth of Conner's reservations and feelings and whether these would "substantially impair" her ability to fulfill her duties as a juror in the case. *See Morgan*, 504 U.S. at 728, 112 S.Ct. 2222. It follows that Orbe cannot succeed on the merits of his underlying juror exclusion claim.[20]

Based on its review of the merits of Conner's exclusion, the Supreme Court of Virginia determined that it was not unreasonable, under *Strickland's* first prong, for Orbe's trial counsel to fail to object to Conner's exclusion. *See Orbe v. Warden*, No. 001708 at 3 (Va. September 10, 2001). Furthermore, given the deference extended to the trial judge's decision on exclusion, the Virginia Supreme Court determined that Orbe had not shown that counsel's failure to raise the issue on appeal resulted in prejudice, as required by

---

**20.** It is worth noting that the underlying improper juror exclusion claim, if valid, could not be disposed of under the "harmless error" doctrine. To be sure, it is possible to argue that the exclusion of Conner was harmless (i) because the prosecutor may have had peremptory strikes remaining and could have excluded her if the trial judge had not, (ii) because no showing was made that the juror who replaced Conner was more inclined than

she to impose the death penalty, or (iii) because the case for death was strong regardless of the jury. Yet, none of these points matter because the right to an impartial jury is a "basic fair trial right[ ] that 'can never be treated as harmless.'" *Gomez v. United States*, 490 U.S. 858, 876, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (citing *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)).

*Strickland*'s second prong. *See id.* Given the teachings of *Morgan, Yeatts,* and *Tipton,* there is no basis to conclude that the Supreme Court of Virginia's determination in this respect was "contrary to" or "an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d). Therefore, Orbe's juror exclusion ineffective assistance claim must be dismissed.

### C. *Claim III(B): Counsel Unreasonably Failed to Ensure Proper Presentation of the Lesser Included Offense*

 Orbe contends that his Sixth Amendment right to counsel was violated by his counsel's failure to present properly the issue of a lesser included offense instruction on first degree murder. This failure included counsel's failure to correct the trial court's alleged misunderstanding of the law on the issue (claim III(B)(1)); counsel's failure to clarify the evidence regarding how easily the gun could have been accidentally fired (claims III(B)(2) & (3)); and counsel's failure to call attention to the Constitution and to pertinent Supreme Court decisions in the argument on direct appeal (claim III(B)(4)). Finding that no evidence supports Orbe's theory that the firing of the gun was accidental, the Supreme Court of Virginia ruled that claims III(B)(1), (2), and (3) failed under *Strickland's* prejudice prong and claim III(B)(4) failed under *Strickland's* performance prong. *See Orbe v. Warden,* No. 001708 at 4–6 (Va. September 10, 2001); *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. In light of this merits adjudication by the state court, these claims must be reviewed under § 2254(d)'s deferential standard.

It is true that a defendant's constitutional rights are violated if the jury is not permitted to consider a lesser included offense when "the evidence would have supported such a verdict." *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (citing *Beck v. Alabama,* 447 U.S. 625, 629–630, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)); *see also Kornahrens v. Evatt,* 66 F.3d 1350, 1354 (4th Cir.1995).[21] Yet, it is equally true that a defendant is not entitled to a lesser included offense instruction if "there is no support for such instructions in the evidence." *Kornahrens,* 66 F.3d at 1354; *see also Hopper,* 456 U.S. at 611, 102 S.Ct. 2049 (holding that due process requires a lesser included offense instruction "*only* when the evidence warrants such an instruction").

Thus, the merits of the lesser included offense claim turn on whether the evidence in Orbe's case supports a verdict of first degree murder, the lesser offense. The Virginia Code defines capital murder, in part, as "[t]he willful, deliberate, and premeditated killing of any person in the commission of robbery or attempted robbery." Va.Code § 18.2–31(4). First degree murder, in turn, is defined in relevant part as "[m]urder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, ... robbery, ... except as provided in § 18.2–31 [capital murder]." Va.Code § 18.2–32. In other words, a defendant who kills "during the course of a robbery, but [does] not kill with willfulness, deliberation, and premeditation" is guilty only of first degree murder, not capital murder. *Briley v. Bass,* 584 F.Supp. 807, 839 (E.D.Va.1984). Thus, to be entitled to a first degree murder

---

**21.** There is some lack of clarity in the cases as to whether the Eighth Amendment or the Due Process clause of the Fourteenth Amendment, or both, may be the constitutional source of this right. *See United States v. Beckford,* 966 F.Supp. 1415, 1420 & n. 2 (E.D.Va.1997) (noting that in *Hopper* the Supreme Court explained *Beck* using both Eighth and Fourteenth Amendment language).

instruction on the facts of this case, Orbe must provide some evidence that the killing, which occurred in the commission of a robbery, was not done by Orbe "with willfulness, deliberation, and premeditation." *Id.*

Under Virginia law, "the evidence relied on to support a proffered instruction must amount to 'more than a scintilla.'" *See Rosen v. Greifenberger*, 257 Va. 373, 380, 513 S.E.2d 861, 865 (1999) (citing *Hatcher v. Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978) (refusing to grant instruction on voluntary intoxication in a murder case, where evidence showed that defendant had been drinking, but no evidence suggested he was intoxicated)). Neither the evidence Orbe offered at trial nor the evidence he could have offered amounts to "more than a scintilla." *Rosen*, 513 S.E.2d at 865.

In his habeas petition, Orbe claims that he shot Burnett "unintentionally, as a result of fear or confusion." Orbe does not claim that some outside or intervening force caused him to shoot the gun accidentally, but rather that he pulled the trigger but did not really mean to shoot. Even though no such arguments were made at trial, Orbe asserts that "Orbe's consistent theory at trial was that he was nervous, his hand shook or clenched involuntarily, and his stepfather's gun discharged only because of its light trigger pull and the short distance the trigger had to traverse to reach the most rearward position." Orbe provides no evidence to support this involuntary shooting theory. He claims that the jury could have inferred a lack of willfulness, deliberation, and premeditation based on the following evidence: (i) the videotape, which recorded only one frame per second and did not show the actual shooting, (ii) the fact that the gun had

been modified and required only a light trigger pull in order to fire, (iii) the fact that Orbe did not use his gun when trying to evade capture, even though he had an opportunity to do so, and (iv) the fact that he fired only one shot. None of this evidence advances Orbe's theory.

First, although the videotape does not capture the instant when the shooting occurred, it does not support the "unintentional shooting" theory. After Burnett was shot, Orbe simply walked around the counter, took the money, and left the store, showing neither concern for Burnett nor surprise that the gun had fired. Second, although the firearms expert testified at trial that the gun had a light action when the hammer was cocked, he also testified that the trigger still would have to be pulled back and held for the gun to fire.[22] Moreover, had Orbe actually presented this unintentional firing argument during the guilt phase of the trial, the prosecution could have easily shown that he was, in fact, quite familiar with the light action of the gun. After all, Orbe had fired the gun at Lois Jones twice two days before shooting Burnett. Third, the shooting of Lois Jones also negates any positive inference the jury might draw concerning Orbe's propensity to shoot the gun intentionally based on his failure to do so while attempting to evade capture. Finally, firing only one shot might be consistent with the accident theory, but it is hardly evidence that the shooting was accidental when no more than one shot was necessary to incapacitate and kill Burnett and complete the robbery. Moreover, Orbe's calm response to the shot that killed Burnett belies the notion that it was inadvertent.

*Mens rea* is frequently inferred from circumstantial evidence when a defendant

---

**22.** The record reflects that a hammer block system prevented the gun from firing unless the trigger was pulled, thus eliminating the possibility that the cocked hammer fell and fired the gun merely due to inadvertent shaking of the gun.

has not himself provided insight into his state of mind. Here, the circumstantial evidence overwhelmingly supports the conclusion that Orbe pulled the trigger deliberately. In the face of this evidence, Orbe asserts that the shooting was somehow involuntary. If this sort of tenuous assertion, without any evidentiary support, were sufficient to overcome the "more than a scintilla" burden required for the lesser included offense instruction, it is hard to imagine a situation where the instruction should *not* be granted. Given the absence of any evidence to support his accidental shooting theory, Orbe cannot, consistent with *Hopper* and *Hatcher*, show entitlement to an instruction on that theory. With no hope of success on the underlying claim, Orbe cannot show prejudice with respect to trial counsel's failures to understand the law and present the available evidence, nor can he show that he was prejudiced by counsel's failure to pursue the lesser included offense claim on appeal. It follows that Orbe's ineffective assistance claims with regard to the lesser included offense instruction were correctly dismissed by the Supreme Court of Virginia under *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, and that this ruling was neither contrary to nor an unreasonable application of federal law.[23]

D. *Claim IV(B): Ineffective Assistance of Counsel in Failing to Protect Orbe's Confidences and Prevent a Conflict of Interest*

■■■ Orbe claims his trial counsel was ineffective in his management of Dr. Pasquale, the psychological expert appointed to assist in his defense, resulting in the release of detrimental confidential communications to the prosecutor and the failure to discover or prevent Dr. Pasquale's "recruitment" as a witness for the prosecution.[24] More specifically, Orbe contends (i) that counsel unreasonably failed to limit Dr. Pasquale's communications with the prosecutor (claim IV(B)(1)); (ii) that counsel unreasonably failed to debrief Dr. Pasquale adequately after those consultations (claim IV(B)(2)); and (iii) that counsel unreasonably failed to inform and consult with Orbe (claim IV(B)(3)). The Supreme Court of Virginia dismissed these claims as "without any factual basis," noting that there was no showing that confidential information was improperly disclosed or that Dr. Pasquale improperly served as a prosecution witness. *See Orbe v. Warden*, No. 001708 at 7–8 (Va. September 10, 2001). Because this claim was adjudicated on the merits by the Supreme Court of Virginia, § 2254(d)'s deferential standard of review applies here.

Orbe contends that relief may be granted on this claim under § 2254(d)(1) because the Supreme Court of Virginia's adjudication was "contrary to or an unreasonable application of" federal law in that it neither mentioned *Strickland* explicitly, nor discussed its performance and prejudice prongs. This argument has already been rejected with respect to claim I(B). *See supra* at n. 13. Simply put, the finding that the underlying claim was meritless resolves both *Strickland* prongs and ends the *Strickland* analysis. *See,*

---

23. The record does not support trial counsel's contention in a post-trial affidavit that his strategy in the guilt phase of the trial was to obtain a first degree murder instruction through an accidental shooting theory. Review of the trial transcript reveals that the accidental shooting theory was neither mentioned in the opening statement nor argued in closing.

24. These ineffective assistance claims are closely related to defaulted claim IV(A), in which Orbe alleged that Dr. Pasquale improperly served as the prosecution's expert as well as the defense expert, resulting in an impermissible conflict of interest and the disclosure of confidential defense information.

*e.g.,* *Wright v. Angelone,* 151 F.3d 151, 161 (4th Cir.1998). Therefore, the Supreme Court of Virginia's failure to discuss the *Strickland* factors is neither unreasonable nor contrary to federal law. Even assuming, *arguendo,* that the Supreme Court of Virginia's adjudication should be reviewed *de novo,* the lack of any showing by Orbe of any conflict of interest or improper disclosure is fatal to Orbe's ineffective assistance claims.

Orbe also seeks relief under § 2254(d)(2), arguing that the Supreme Court of Virginia's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The Supreme Court of Virginia's ruling relies almost entirely on the affidavits of the prosecutor and Dr. Pasquale. Orbe argues that these affidavits were self-interested and should be discounted. However, even disregarding the affidavits by the prosecutor and Dr. Pasquale entirely, the record provides no evidence to suggest that the Supreme Court was unreasonable or incorrect in its factual findings.

The relevant facts regarding Dr. Pasquale's contact with the prosecution are not disputed. At the direction of Mr. Protogyrou, Orbe's trial counsel, Dr. Pasquale spoke with the prosecution by telephone twice before trial, for about one hour each time. Mr. Protogyrou directed Dr. Pasquale to accept these calls from the prosecution regarding his report in order to assist in the preparation of the defense.[25] In Dr. Pasquale's post-trial affidavit, he avers that the conversations consisted merely of discussions of his submitted report, that no nonobvious defense strategies were discussed with the prosecution, and that he properly debriefed Orbe's counsel

after the calls. Yet, it is during these calls that Orbe contends, without factual basis, that Dr. Pasquale was recruited as a prosecution witness and that protected defense information was divulged.

In addition to these phone calls, Orbe contends that a particularly damaging piece of evidence should not have been provided to the prosecution. Specifically, Orbe's counsel related to Dr. Pasquale in a letter that "Dennis is at a point where he has discussed the fact that he would just rather die than live the rest of his life in prison." This letter was subsequently provided to the prosecution by Orbe's counsel, because it had been listed in Dr. Pasquale's report as a source of information for the report. Orbe contends that the letter should not have been provided or that this particular sentence should have been redacted. The prosecutor used this statement in arguing to the jury that Orbe would pose a higher risk of escape from prison because he would rather die than remain in prison for his whole life. This arguably undercut the defense argument that Orbe would not pose a future risk if incarcerated for life.

This record does not support Orbe's contention that confidential information was improperly leaked to the prosecution through counsel's mishandling of Dr. Pasquale. Orbe provides no evidence to contradict Dr. Pasquale's post-trial affidavit denying that he improperly divulged confidential information during his discussions with the prosecution. The trial record does not show that the prosecutor used any psychological information obtained from the defense that was not contained in Dr. Pasquale's official report, except for Orbe's statement regarding his willingness to die rather than face life in prison. Yet,

---

25. Apparently, these calls were expected to assist the defense by providing Dr. Pasquale with a "rehearsal" for cross examination and providing defense counsel information regarding the prosecutor's likely arguments at trial.

as the Supreme Court of Virginia noted, it was Orbe's counsel, not Dr. Pasquale, who provided the prosecutor with the letter containing that statement. In short, the record simply does not provide any evidence that Dr. Pasquale improperly divulged any information.

The trial record likewise does not support Orbe's assertion that Dr. Pasquale was recruited as a witness for the prosecution and operated under a conflict of interest. In this respect, Orbe argues that Dr. Pasquale decided, either on his own initiative or at the request of the prosecution, to serve as a witness for the prosecution or a neutral witness for the court, rather than an independent witness for the defense. In the absence of any evidentiary support for this claim, Orbe simply contends that Dr. Pasquale's allegiance to the ethical rules of his profession made him improperly neutral. However, these ethical rules simply require forensic psychologists to avoid "misrepresentation of their evidence" and resist "partisan attempts to avoid, deny, or subvert the presentation of evidence contrary to their own position." *See Specialty Guidelines for Forensic Psychologists*, 15 Law & Hum. Behav. 664 (referenced by Dr. Pasquale in his post-trial affidavit). Dr. Pasquale's asserted allegiance to "the ethical boundaries" of his profession does not support the contention that he became a neutral witness at the service of the court or the prosecutor, thus abandoning his function to "assist the defense." *See* Va.Code § 19.2–264.3:1(A). Surely, allegiance to ethical rules requiring honesty cannot constitute a betrayal of the duty to assist the defense. Put differently,

Orbe is not constitutionally entitled to an unethical or dishonest expert to aid his case. Nor is Orbe constitutionally entitled to an expert who serves as his champion and operates, in effect, as another lawyer.

Orbe also points to statements made by Dr. Pasquale regarding mitigating factors and future dangerousness which were damaging to Orbe's case, contending that these statements are evidence that Dr. Pasquale was serving the prosecution, not the defense. A review of the transcript indicates that Dr. Pasquale provided some unfavorable information regarding the issue of Orbe's future dangerousness. Moreover, while Dr. Pasquale did provide evidence of mitigating factors, he also disclosed facts that arguably undercut the mitigation case.[26] Because Dr. Pasquale provided on direct examination the type of statements that are usually elicited from a witness on cross examination, Orbe contends that Dr. Pasquale had, in fact, been improperly recruited by the prosecutor as a prosecution witness.

 The mere fact that Dr. Pasquale presented balanced testimony with regard to the mitigating factors and Orbe's future dangerousness does not indicate that he had improperly abandoned his duty as an expert appointed "to assist the defense." Even completely unfavorable testimony would not constitute evidence of conversion of or abandonment by the expert, provided it was reasonable and accurate. An indigent defendant is not constitutionally entitled to an expert of his own choosing or to an expert who will provide only favorable testimony. Instead, what is re-

---

**26.** For example, on direct examination Dr. Pasquale volunteered the information that Orbe "was rather candid in telling me that he had hit his wife before they were married," and also that he "found out" that Orbe also struck his wife on other occasions when drunk. Also, when Dr. Pasquale testified that Orbe's "perceptions were distorted" at times during his crime spree, a possible mitigating factor, Dr. Pasquale also noted that Orbe is "still responsible for what occured." Again, when Dr. Pasquale mentioned that Orbe was not violent during the spree "when there was time to think," he also stated that "one can also argue the fact that he shot somebody else, though."

quired is that the "State ... assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).[27] Although portions of Dr. Pasquale's testimony may have been detrimental to Orbe's case, a review of that testimony as a whole does not support Orbe's contention that he was improperly biased in the prosecution's favor, that he had been recruited to serve as a prosecution witness, or that Orbe had been improperly forced to "share" his expert with the prosecution. Therefore, the Supreme Court of Virginia was not unreasonable in concluding that there is no factual basis to support Orbe's theory that his psychological expert labored under a conflict of interest.

In sum, the Supreme Court of Virginia concluded, reasonably and correctly, that there is no factual support in the record showing either that confidences were divulged or that Dr. Pasquale was anything other than a competent psychologist for the defense. *See Orbe v. Warden*, No. 001708 at 7–8 (Va. September 10, 2001). Therefore, Orbe's claims of ineffective assistance on these grounds must fail under both prongs of *Strickland*, because he has not shown that trial counsel's management of Dr. Pasquale was deficient, or that he was prejudiced by the alleged mismanagement of Dr. Pasquale. In other words, the Supreme Court of Virginia properly dis-

missed these claims as "without factual basis," *id.* at 8, and Orbe's corresponding claims must be likewise dismissed on federal habeas review.

Embedded within these arguments, Orbe seeks to present a new claim in his federal habeas petition. He contends that his confidences were improperly divulged by his trial counsel when counsel disclosed to the prosecutor a letter Orbe's trial counsel had written to Dr. Pasquale. This letter contained the statement regarding Orbe's willingness to die rather than spend his life in prison. Specifically, Orbe argues that his counsel (i) should never have included such sensitive information in a letter in the first place, (ii) should have refused to turn the letter over to the prosecution, or (iii) should have redacted this statement before turning the letter over. This claim regarding *counsel*'s disclosure of defense information was not presented or argued during the state habeas proceedings; instead, Orbe argued in his state habeas petition, incorrectly, that Dr. Pasquale had provided the prosecutor with Orbe's statement.[28] Thus, because this claim was "not presented to the Supreme Court of Virginia on direct appeal nor in state habeas corpus proceedings," it is procedurally defaulted under the rule in *Gray* unless Orbe can "demonstrate cause and prejudice for the default." *Gray v. Netherland*, 518 U.S. 152, 161–62, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). Orbe makes no attempt to show either cause or preju-

---

**27.** The *Ake* court explained that "[t]his is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id.; see also Pruett v. Thompson*, 771 F.Supp. 1428, 1441–42 (E.D.Va.1991) ("A criminal defendant has no constitutional or Virginia state law right to a psychiatrist of his own choosing, or to 'shop around' at state expense for experts who will present the most advantageous opinions possible.").

**28.** The Warden pointed out in his motion to dismiss Orbe's state habeas claim that trial counsel, not Dr. Pasquale, provided the prosecution with this information. The Supreme Court of Virginia noted this fact in dismissing the claim. *See Orbe v. Warden*, No. 001708 at 8 (Va. September 10, 2001). Orbe's reply brief opposing the dismissal did not argue that *counsel*'s disclosure was improper, nor did Orbe seek to amend his state habeas petition to raise the claims detailed above.

dice for the default, nor is any apparent. Therefore, Orbe's claim regarding counsel's disclosure of confidential defense information must be dismissed as procedurally defaulted.

*E. Claim V(B): Counsel Unreasonably Failed to Ensure that Orbe had the Appropriate Assistance of an Expert*

The next set of claims also involves counsel's performance in choosing, preparing, and managing Dr. Pasquale. Claims V(B)(1) through (4) were all addressed on the merits during the state habeas proceeding, and therefore the Supreme Court of Virginia's dismissal of the claims under *Strickland* must be reviewed under § 2254(d)'s deferential standard. Claim V(B)(5) was apparently not addressed on the merits, and therefore will be reviewed *de novo* before this court.

 In Claim V(B)(1), Orbe alleges that his counsel was ineffective because he relied only on Virginia law in requesting the appointment of a mental health expert, and did not cite *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).[29] Yet, Orbe does not identify any way in which reliance on *Ake* would have provided him with anything beyond what is provided by the Virginia statute. Conscious of this, Orbe does not seriously press this claim, but includes it only in the event that the failure to cite *Ake* might prove material in some way unknown to Orbe and his present counsel. Yet, it is clear that the Supreme Court of Virginia reasonably and correctly applied federal law to conclude that because there is no indication that citing *Ake* would have benefitted Orbe's defense or changed the outcome at trial, the prejudice prong under *Strickland* cannot be shown. *See Orbe v. Warden*, No. 001708 at 8 (Va. September 10, 2001).

Therefore, this claim must be dismissed pursuant to § 2254(d).

In Claim V(B)(2), Orbe alleges that his counsel unreasonably failed to ensure that his expert was independent, rather than neutral. This claim is essentially a reprise of the conflict of interest claim discussed above. According to Orbe, a neutral expert's primary function is to assist the court, while an independent expert, as Orbe puts it, "forms a conclusion and presents truthful testimony in the light most favorable to his client's cause, and then, if asked explains (or explains away) on cross-examination the ways in which the facts might also support a different conclusion." The Supreme Court of Virginia ruled that this claim was without merit, noting that no precedent supports Orbe's argument that an expert is not "independent" simply because his testimony is not uniformly "favorable" to the defendant and that Orbe's contention regarding a conflict of interest had already been found meritless. *See Orbe v. Warden*, No. 001708 at 8 (Va. September 10, 2001).

This ruling is neither an incorrect nor an unreasonable application of federal law. An indigent defendant in a capital case is entitled to a psychiatric expert to "assist in preparation at the sentencing phase." *Ake*, 470 U.S. at 84, 105 S.Ct. 1087; *see also* Va.Code § 19.2–264.3:1 (requiring that indigent defendants in capital cases be appointed a mental health expert to "assist the defense"). Neither state nor federal law guarantees the defendant an "independent" expert as defined by Orbe. In the cases, "independent" as opposed to "neutral" means that the expert must be additional to, and separate from, court-appointed experts or experts engaged by the prosecution. *See Tuggle v. Commonwealth*, 230 Va. 99, 101, 334 S.E.2d 838,

---

**29.** Thus, the order granting the appointment of a mental health expert, which was drafted by Orbe's trial counsel, relied solely on Virginia Code § 19.2–264.3:1.

840 (1985) (contrasting the defendant's independent expert with a neutral examiner); *Ake,* 470 U.S. at 81, 105 S.Ct. 1087 (emphasizing the importance of expert evidence for each party). There is no state or federal precedent suggesting that the phrase "assist the defense" requires the type of partisan expert advocacy Orbe envisions. Therefore, this claim must be dismissed.[30]

In claim V(B)(3), Orbe contends that counsel unreasonably failed to investigate and provide Dr. Pasquale with information about Orbe's alleged physical abuse of his wife. During the sentencing phase of the trial, Dr. Pasquale testified repeatedly that Orbe struck his wife on multiple occasions. The accuracy of these statements is disputed. Dr. Pasquale's report indicates that Orbe admitted hitting his wife only once, but that Orbe's ex-mother-in-law, Sallie Clark, told Dr. Pasquale that Orbe hit his wife on multiple occasions. Yet, in a post-trial affidavit, Clark denies telling Dr. Pasquale that Orbe abused his wife. Orbe speculates that Dr. Pasquale did not accurately recall what Clark had told him, perhaps confusing Orbe with another of his patients. Orbe argues further that trial counsel knew or should have known that Dr. Pasquale was going to present testimony regarding Orbe's spousal abuse and therefore had a duty to conduct his own investigation to determine if the information Dr. Pasquale had received was accurate.

In this respect, *Strickland* is clear: it requires more than merely showing that additional efforts by counsel might have been beneficial; instead *Strickland* requires a showing that counsel's representation "fell below an objective standard of reasonableness" and that there is a "reasonable probability" that counsel's failure affected the outcome of the proceeding. *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052. The Supreme Court of Virginia found that this claim failed under *Strickland* for lack of prejudice, even assuming that Clark's denial was true, because there was no reasonable probability that the sentence would have differed "if the evidence had shown that he hit his former wife only once instead of four or five times." *See Orbe v. Warden,* No. 001708 at 9 (Va. September 10, 2001). This conclusion is a reasonable application of *Strickland,* given the record as a whole, particularly in light of the evidence of Orbe's violent and dangerous actions during his ten day crime spree.[31] Therefore this claim must be dismissed.

In claim V(B)(4), Orbe contends that his trial counsel failed to provide Dr.

---

30. Once again, Orbe argues that because the Supreme Court of Virginia did not explicitly address *Strickland* in its adjudication of this claim, that adjudication is contrary to federal law and the claim must therefore be reviewed *de novo.* As previously noted, the mere failure to cite *Strickland* does not indicate that the Supreme Court of Virginia applied the wrong legal principles. In any event, the claim is meritless whether reviewed *de novo* or pursuant to § 2254(d). *See supra* at n. 13.

31. Orbe attempts, unsuccessfully, to downplay the degree to which the incidents that occurred during the ten day crime spree reflect his violent and dangerous nature. In this regard, Orbe contends that the record shows that many of the people Orbe threatened seem to have been strangely unafraid of him. For example, even while Orbe was holding Scougal at gunpoint, Scougal demanded that Orbe remove Scougal's sweater that he had taken and was wearing, and twice refused to give Orbe his car keys. Also at gunpoint, Bottoms and Powell refused Orbe's demand to enter the house. Orbe also points out that he did not shoot at the police during his attempt to evade arrest. While all this is true, it is also true that during this brief ten day period he shot two people, killed one, and terrorized several others.

Pasquale with information from his family, as well as school and health records, which information Orbe claims was necessary for an adequate presentation of the mitigating factors of mental illness and the extent of Orbe's sexual and physical abuse as a child. The Supreme Court of Virginia denied this claim under both the performance and prejudice prongs of *Strickland* because "[m]ost of the information that [Orbe] claims should have been provided ... was, in fact, presented at trial through other sources," and, given what was presented to the jury, "[t]he remaining evidence identified by [Orbe] ... would not likely have produced a different result at trial." *See Orbe v. Warden,* No. 001708 at 9 (Va. September 10, 2001). A review of the trial record and the affidavits submitted by Orbe confirms that the Supreme Court of Virginia's determination in this respect is neither contrary to *Strickland,* nor an unreasonable application of the rule in that case.

To begin with, virtually all of the mitigation information Orbe argues should have been introduced was, in fact, presented in some form in the sentencing hearing. Thus, Dr. Pasquale testified that Orbe's father had abandoned him at an early age and that one of his stepfathers was an alcoholic who abused him. He also testified that Orbe was badly beaten and seriously injured at the age of seventeen by a group of teenagers at a basketball court, and that he did poorly in high school, ultimately dropping out.[32] Dr. Pasquale testified that Orbe had been an alcoholic since the age of fourteen. He also testified that Orbe suffered from chronic major depression, was preoccupied with the idea

of suicide and had unsuccessfully sought help from a mental health clinic, including requesting to be admitted to a psychiatric hospital.

The only non-cumulative piece of new information provided in the post trial affidavits is a claim by Orbe's brother that Orbe was sexually abused by his grandfather as an infant. Yet, counsel's failure to uncover this information was not unreasonable. Orbe denied any sexual abuse during his interviews with Dr. Pasquale, and trial counsel was entitled to rely on Orbe's statements in directing his investigation. As *Strickland* teaches, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

Significantly, this case does not present a situation, as in *Terry Williams,* where counsel failed to uncover and present a wealth of mitigating information. *See Terry Williams,* 529 U.S. at 362, 120 S.Ct. 1495. There, Williams's counsel failed to present extensive documentation detailing his "nightmarish childhood," including the imprisonment of Williams's parents for criminal neglect of him and his siblings, and severe and repeated abuse by his father. *Id.* at 395, 120 S.Ct. 1495. Counsel also did not present evidence that Williams was "borderline mentally retarded," that he did not go beyond sixth grade in school, and that he had been commended for his good behavior in prison. *Id.* at 396, 120 S.Ct. 1495. Such a performance was clearly deficient, and stands in sharp contrast

**32.** Orbe argues that the "few, dry, restrained references to childhood abuse could not adequately inform a jury about the severity and extensiveness of the traumas inflicted on Dennis Orbe...." Significantly, this argument attacks the *manner* in which Dr. Pasquale relayed the mitigating information, not the

amount of information he provided. As such, this claim must be rejected, for as discussed *supra* at pp. 774–75 & n. 27, the fact that Dr. Pasquale was not an optimal advocate on Orbe's behalf affords Orbe no grounds for constitutional relief.

to the record in Orbe's case, where virtually all of the mitigating evidence was, in fact, presented to the jury. Therefore, the Supreme Court of Virginia's conclusion that this claim fails under *Strickland* was a reasonable application of the proper governing legal principles. Accordingly, this claim must be dismissed pursuant to § 2254(d).

In claim V(B)(5), Orbe contends that his trial counsel unreasonably failed to request the appointment of a medical doctor or a neuropharmacologist to testify that medications were available to treat and control Orbe's mental problems and curb his dangerous behavior.[33] Orbe contends that such testimony would have been vitally important during sentencing, both with regard to the aggravating factor of future dangerousness and as a mitigating factor to lessen Orbe's culpability for the offense.

The Supreme Court of Virginia rejected this claim without addressing its merits. Instead, the claim was summarily rejected on the grounds (i) that it was "purely speculative," (ii) that there was no showing as to what a medical doctor or pharmacologist might have said, and (iii) that, in any event, Orbe had the assistance of Dr. Pasquale, his chosen expert.[34] At the same time, the Supreme Court of Virginia denied Orbe's motion for the appointment of a psychiatrist to provide the support lacking in his claim. As a result, this claim, having been presented to the state courts and exhausted, but never addressed on the merits, is properly adjudicated here *de novo*. *See Weeks*, 176 F.3d at 258 (4th Cir.1999).

Under *Strickland*, Orbe must show that there is a "reasonable probability" that the outcome of his sentencing would have been different absent counsel's failure to request the appointment of a medical doctor or pharmacologist. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. When petitioners allege ineffective assistance for counsel's failure to present expert testimony, in some instances it is not possible to perform the prejudice analysis without appointing an expert to determine what the testimony would have been. *See Cardwell v. Netherland*, 971 F.Supp. 997, 1008 (E.D.Va.1997).[35] Indeed, Orbe has re-

33. Although the Supreme Court of Virginia's ruling on this claim might be read to suggest that a psychologist, who is neither a medical doctor nor neuropharmacologist, is not qualified to testify as an expert regarding medication for mental illnesses, that is not a fair reading. To be sure, psychologists typically cannot prescribe medications. Yet, it does not follow that they are unqualified to testify concerning the availability and effects of medications. Indeed, neuropharmacologists may also be unable to prescribe medicines unless they are also medical doctors. Like pharmacologists, psychologists, by virtue of their training and clinical experience, may well be qualified to provide such testimony. In any event, the disposition of this claim in Orbe's federal habeas proceeding does not depend on any distinction between psychologists and psychiatrists.

34. The Supreme Court of Virginia's full discussion of claim V(B)(5) is as follows:

In claim V(B)(5), petitioner alleges counsel was ineffective by failing to request the appointment of a medical doctor or neuropharmacologist, because, unlike a psychologist, such experts could have testified about available medications to treat and control petitioner's mental problems. This claim is purely speculative. Petitioner has not shown what a medical doctor and neuropharmacologist would have said regarding petitioner's mental condition and whether any medications are available that would actually control petitioner's behavioral problems. Petitioner has no right to present speculative evidence regarding how he might respond to particular drug therapies. He received the full assistance of his personally chosen expert, Dr. Pasquale.

35. As explained in *Cardwell*, in these situations "a complete expert report is clearly relevant, for it is impossible to evaluate whether [petitioner] was prejudiced by a failure to

newed his 848(q) motion requesting funds to retain a psychiatrist for this purpose.[36] *See* 21 U.S.C. § 848(q). Yet, here, unlike *Cardwell,* it is possible, for two reasons, to evaluate the prejudice caused by counsel's failure to request the appointment of a medical doctor without appointing the requested expert. First, there is a wealth of information regarding Orbe's mental health in the record. Second, it is also possible here to assume for the purpose of analysis what additional information the requested expert would provide and to evaluate possible prejudice on that basis. This assumption is possible both because of the wealth of mental health information in the record and because Orbe has indicated with some precision what he hopes and expects his requested psychiatric expert to say.

In contrast to *Cardwell,* where no psychological expert testified, the record in this case shows that the jury was fully informed concerning Orbe's mental health conditions. Thus, Dr. Pasquale testified that Orbe suffered from chronic major depression.[37] Further, the jury was exposed to the possibility that Orbe's illness might have been treatable through medication, and that Orbe had sought and had been denied treatment for his depression. In his discussion of mitigating factors, Dr. Pasquale also testified that

> . . . there was no history of psychiatric treatment, so that this was not an individual—this was important to me at this point, too, that he had not been under

treatment, was not on medication, he was not having something that would perhaps assist him with this.

With regard to future dangerousness as an inmate, Dr. Pasquale also noted that Orbe might be given medication and treatment while in prison, stating:

> . . . I understand that most prisons still have some medication programs, of course, I can't guarantee that he would be placed in a circumstance where there would be medication, but I think that most of the maximum security penitentiaries, as far as my limited knowledge of that goes, I think that they have mental health circumstances involving medication there.

Thus, despite the lack of testimony from a medical doctor, the possible availability of medication as a mitigating factor was presented to the jury. At most, this presentation lacks only a more specific statement on the availability and reliability of medication for treating Orbe's mental illness.

Even assuming, *arguendo,* that a psychiatrist or pharmacologist appointed in this case would testify as Orbe contends, namely "that medication administered by prison personnel could reliably and effectively control Orbe's behavior," it does not follow that there is a reasonable probability that this additional testimony would have altered the jury's verdict. Importantly, Dr. Pasquale did tell the jury that Orbe would not pose a danger in prison, unless he had access to alcohol or was placed under du-

---

present certain testimony until the substance of that testimony is known." *Cardwell,* 971 F.Supp. at 1008; *see also id.* at 1012 (finding such testimony not only "relevant" but "reasonably necessary" and granting the motion to appoint a psychiatrist).

36. Orbe filed a § 848(q) motion for funds for a psychiatrist before filing his habeas petition, which was denied for failure to show good cause that the services of a psychiatrist were reasonably necessary at that point in time,

without prejudice to Orbe renewing the motion after his habeas petition was filed. *See Orbe v. True,* Civil Action No. 01–1845–A (E.D. Va. April 17, 2002) (Order).

37. Orbe claims that this diagnosis was inaccurate, and that Orbe should have been diagnosed with bipolar disorder, although Orbe also concedes that the symptoms and nature of Orbe's illness were properly captured by Dr. Pasquale's testimony. *See infra* discussion of claim VI(B)(2) at pp. 782–84.

ress. It is hard to see what, if anything, a psychiatrist's testimony would have added. Arguably, a psychiatrist might have testified in addition that Orbe would not pose a danger in prison, provided he took his medication. But just as Dr. Pasquale could not guarantee that Orbe would not gain access to alcohol or come under stress in prison, so, too, the psychiatrist could not guarantee that Orbe would faithfully take his medicine. Similarly, neither Dr. Pasquale nor a psychiatrist could confidently predict how Orbe might act were he to escape from prison.

In sum, even assuming that a medical doctor or pharmacologist had testified as Orbe contends, namely that medications exist which can curb his dangerous behavior, Orbe has not shown that there is a "reasonable probability" that this additional testimony would have altered the jury's verdict. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. It follows, then, that Orbe cannot show prejudice for his counsel's failure to present such testimony. *See id.* Accordingly, the ineffective assistance claim on this ground must be dismissed. Similarly, having determined that there is no reasonable probability that this additional testimony would have altered the outcome of the trial, it follows that it is not "reasonably necessary" to grant Orbe funds to retain a medical doctor or pharmacologist. *See* 21 U.S.C. § 848(q)(9). Therefore, Orbe's renewed motion for funds for a psychiatrist must likewise be denied.

### F. Claim VI: Ineffective Assistance

Claim VI involves a series of ineffective assistance of counsel claims, some of which are repetitive of claims brought elsewhere in Orbe's petition. They are discussed in sequence below.

In claim VI(A), Orbe contends that trial counsel rendered ineffective assistance by questioning potential jurors during voir dire in a manner that allegedly encouraged them to disregard their impulse for mercy. During voir dire, trial counsel asked most of the potential jurors "Do you think that the decision as to whether to impose a life sentence or a death sentence should be made just on the facts and that mercy should have nothing to do with it?"[38] Of the twelve jurors who decided Orbe's sentence, ten answered this question "just the facts," one was not asked the question, and one indicated that mercy should also be considered. Orbe contends that posing this question constituted ineffective assistance of counsel because the wording of the question led many jurors to believe, incorrectly, that mercy was legally irrelevant, contrary to both Orbe's interests and the applicable law. *See Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (noting that "the decision to afford an individual defendant mercy" does not violate the Constitution); *Whitley v. Commonwealth,* 223 Va. 66, 82, 286 S.E.2d 162, 171 (1982) (noting that a jury in a capital murder case has discretion to impose a life sentence "if moved by an impulse of mercy").

Although the phrasing of this voir dire question may have been infelicitous, there is simply no reason to conclude that any juror was misled by the question to believe that the law precluded consideration of mercy. Even assuming some jurors were misled, their mistake was only temporary, as the error was clearly corrected by the trial court's instruction during the penalty phase. At that time, the jurors were properly instructed to

---

**38.** On some of the occasions, the question was phrased "just on the facts *or* that mercy should have nothing to do with it?" (emphasis added).

consider any evidence presented of circumstances which do not justify or excuse the offense but which, in fairness *or mercy,* may extenuate or reduce the degree of moral culpability and punishment.[39]

(emphasis added). The Supreme Court of Virginia concluded that the jury was properly instructed to consider all mitigating evidence under *Buchanan v. Angelone,* 522 U.S. 269, 278–79, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). *See Orbe v. Warden,* No. 001708 at 11 (Va. September 10, 2001). And, it is settled that the normal presumption is that jury instructions are curative of potential improper inferences. *See, e.g., Bell v. Evatt,* 72 F.3d 421, 434 (4th Cir. 1995). In *Bell,* a proper jury instruction "clearly corrected any bias or prejudice the jury might have inferred" from a remark by the trial judge which suggested that the defendant was merely pretending to be mentally incompetent. *Id.* If an appropriate instruction was held to correct a potentially improper statement by the trial judge, surely an appropriate instruction must likewise be sufficient to correct a potentially misleading voir dire question posed by defense counsel. Thus, even assuming, *arguendo,* that counsel's performance was unreasonably deficient in the framing of the voir dire question, the Supreme Court of Virginia was both reasonable and correct in its conclusion that the curative instruction eliminated any prejudice and hence no prejudice has been shown under *Strickland. See Orbe v. Warden,* No. 001708 at 11 (Va. September 10, 2001). Therefore, pursuant to § 2254(d), this claim must be dismissed.

In claim VI(B), Orbe claims ineffective assistance of counsel during the sentencing phase of his trial because counsel failed to discover and present available mitigating evidence. The Supreme Court of Virginia found that each subpart of this claim failed under the *Strickland* test either because counsel's performance was not inadequate, or because no prejudice was shown. *See Orbe v. Warden,* No. 001708 at 11–12 (Va. September 10, 2001). The bulk of this claim has already been addressed and dismissed in relation to claims V(B)(3) & (4), in which Orbe alleged ineffective assistance of trial counsel in connection with managing and preparing Dr. Pasquale.[40]

In claims VI(B)(1) and (4), Orbe contends that counsel unreasonably failed to investigate evidence of sexual, physical, and emotional abuse and that counsel unreasonably failed to gather and present this evidence from family and friends. These claims have already been addressed in connection with claim V(B)(4). *See supra* pp. 777–79. In essence, counsel reasonably relied on Orbe's own statements in refraining from looking for evidence of early childhood sexual abuse, *see Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, and most of the information obtained in the second investigation from Orbe's family and friends was, in fact, presented at trial. *See supra* pp. 777–79. Therefore, the Supreme Court of Virginia reasonably and correctly found that Orbe had failed to show that his counsel's performance was deficient with respect to this claim. *See Orbe v. Warden,* No. 001708 at 11–12 (Va. September 10, 2001). Thus, these claims must be dismissed pursuant to § 2254(d).

In claim VI(B)(2), Orbe further contends that trial counsel unreasonably failed to

---

**39.** Orbe contends, unpersuasively, that this instruction was not adequate. He maintains that the phrase "consider any evidence presented" reinforces the notion that the jury's decision should be made "just on the facts."

Yet, the instruction, fairly read, clearly allows the jurors to consider mercy as an independent factor in weighing the verdict.

**40.** *See supra* at pp. 777–79.

present evidence that Orbe might have suffered from bipolar disorder. According to Orbe, bipolar disorder, or manic-depressive illness, is "marked by uncontrolled and radical shifts from profound depression to extreme mania." Orbe proffers affidavits from family members describing behavior that allegedly supports a diagnosis of bipolar disorder, and contends that his counsel should have performed a more thorough investigation and provided Dr. Pasquale with this information.

The record does not support Orbe's contention that counsel failed to provide Dr. Pasquale with sufficient information. As the record plainly reflects, Dr. Pasquale gathered ample information from trial counsel, from his own lengthy discussions with Orbe, and from his interview with Orbe's mother, to reach a reasoned diagnosis of Orbe's condition. The record does not support Orbe's contention that Dr. Pasquale was unaware of the manic aspects of Orbe's behavior.[41] Most of the evidence now proffered by Orbe in support of a bipolar disorder diagnosis is cumulative of evidence actually considered by Dr. Pasquale. Thus, Orbe's real complaint is his claim that Dr. Pasquale reached the wrong diagnosis.

Furthermore, to the extent that Orbe contends that counsel should have prevented Dr. Pasquale's allegedly erroneous diagnosis of major chronic depression by providing more relevant detail with respect to Orbe's family history and psychological background, Orbe turns the roles of psychological expert and legal counsel on their heads. It is well established that "[a]ttorneys are generally not required to second-guess their experts' examinations or opinions." See Pruett v. Thompson, 996 F.2d 1560, 1573–74 (4th Cir.1993); see also Poyner v. Murray, 964 F.2d 1404, 1418

(4th Cir.1992) (holding that deficiencies in the performance of experts are not to be automatically imputed to the performance of counsel). Surely, it is reasonable and appropriate for trial counsel to rely on the advice and assistance of a psychologist in determining the depth and focus of a psychological investigation. See Va.Code § 19.2–264.3:1 (authorizing the appointment of a psychiatric expert "to *assist* the defense *in the preparation and presentation* of information concerning the defendant's history, character, or mental condition") (emphasis added).

■ In sum, even assuming *arguendo* that Dr. Pasquale's diagnosis was flawed, Orbe has not shown that counsel was unreasonable in relying upon it or in failing to conduct a more detailed investigation of his own. See Goins v. Angelone, 52 F.Supp.2d 638, 644 (E.D.Va.1999) ("Regardless of whether [the psychological expert's] report was flawed, counsel's reliance upon the report in this instance appears to have been wholly reasonable."). It follows that the Supreme Court of Virginia was reasonable and correct in dismissing this claim under the performance prong of *Strickland.* See Orbe v. Warden, No. 001708 at 11–12 (Va. September 10, 2001).

■ In claim VI(B)(3), Orbe contends that his counsel rendered ineffective assistance by failing to present Chesterfield Mental Health Department records which would have confirmed that Orbe was suicidal and had sought treatment for mental illness. These records indicate that on May 21, 1997, Orbe sought treatment for alcohol and drug abuse and reported "suicidal ideation" but "no plan." Dr. Pasquale testified that Orbe told him that his "number one goal" during the ten day

---

41. For example, Dr. Pasquale's report summarizes Orbe's symptoms as "chronic major depressive signs ... with the addition of ...

severe agitation, although aggressively, violently and impulsively acting out."

episode was to die.[42] Orbe contends, therefore, that the Chesterfield medical records would have presented clear and objective documentation of the severity and duration of Orbe's illness, and would have rehabilitated Dr. Pasquale's testimony regarding suicidal intent.

The Supreme Court of Virginia dismissed this claim under the "performance" prong of *Strickland. See Orbe v. Warden,* No. 001708 at 12 (Va. September 10, 2001). Orbe argues that this ruling is an unreasonable application of *Strickland.* Assuming, without deciding, that this is so, the claim nonetheless must be dismissed under the "prejudice" prong in *Strickland* after *de novo* review. First, the Chesterfield records do not objectively corroborate Orbe's suicidal intent. They indicate only that Orbe reported he was suicidal, not that he was found suicidal by a treating physician or given treatment for suicidal tendencies. Indeed, the records show that he was refused treatment on that basis. Second, although the jury was not shown the Chesterfield records, they were informed that Orbe sought mental health treatment before the January crime spree. Finally, as brought out at trial, other statements and actions by Orbe indicate a strong ambivalence with regard to suicide, with or without the addition of the Chesterfield records.[43] For these reasons, even assuming that the question of whether or not Orbe was suicidal at the time of the crime spree was relevant to the jury's verdict, it is unlikely that the presentation of the Chesterfield records would have significantly altered the jury's conclusion on that question. It follows that Orbe has not shown that there was a "reasonable probability" that presenting the Chesterfield records would have affected the outcome of the trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Therefore, even assuming, as Orbe argues, that the Supreme Court of Virginia's adjudication of this claim under the "performance prong" of *Strickland* was unreasonable, this claim nonetheless must be dismissed upon *de novo* review for lack of prejudice under *Strickland.*

After considering the various individual claims alleging ineffective assistance of counsel for failure to present mitigating evidence, it is necessary to also consider these claims as a whole and "evaluate the totality of the available mitigation evidence." *See Terry Williams,* 529 U.S. at 397–98, 120 S.Ct. 1495. In *Terry Williams,* entire areas of mitigating evidence were not presented. The jury was not told that Williams's parents had been imprisoned for criminal neglect of him and his siblings, that he had been repeatedly beaten by his father, that he suffered in an abusive foster home, and that he was borderline mentally retarded. *Id.* at 396, 120 S.Ct. 1495. Thus, the failure to present this evidence quite likely had an effect on the outcome of Williams's sentencing, and the Supreme Court found these failures to be prejudicial. *Id.* In Orbe's case, by contrast, virtually all of the available mitigating evidence was in fact presented to the

---

42. The prosecution attempted to undermine the suicide theory by pointing out that the suicidal intent was self-reported and that many of Orbe's actions reflected the contrary, namely a strong interest in self-preservation.

43. Dr. Pasquale testified concerning "the ambivalence that Mr. Orbe continued to experience, back and forth about whether or not he should take his life.... right up to January, 1998." This ambivalence is reflected in the trial record. Orbe told Dr. Pasquale that, two months prior to his crime spree, Orbe put his stepfather's gun to his head but could not pull the trigger. Orbe told his victims during the crime spree that he had "nothing to lose," and told Dr. Pasquale that his intent at the time was to die; yet, he packed two suitcases of clothes for a trip and avoided drawing his gun during his final attempt to evade the police.

jury. Among other things, the jury was told that Orbe's father had abandoned him at an early age, that his stepfather physically abused him, and that he had been badly beaten by a group of teenagers when he was seventeen. The jury was also told that Orbe had been an alcoholic since the age of fourteen, that he suffered from chronic major depression, that he had an impulse control dysfunction, that he was preoccupied with suicide, and that he had sought and been refused mental health treatment. *See* discussion of claim (V)(B)(4) *supra* at pp. 777–79. Against this wealth of mitigating detail, Orbe argues in various claims that the issues should have been presented with more convincing and compelling detail, that the possibility of sexual abuse as a young child was not discovered, and that the psychological expert was not given enough evidence to correct an allegedly false diagnosis. Unlike *Terry Williams*, the question here is one of the degree and quality of mitigating evidence offered, not the total failure to present entire areas of available mitigating evidence.

In weighing the overall prejudice caused by counsel's omissions, courts must also consider the strength of the prosecution's evidence offered in support of the jury's finding of future dangerousness. *See Terry Williams*, 529 U.S. at 398, 120 S.Ct. 1495. The January 1998 incidents presented powerful evidence of Orbe's dangerousness. The shooting of Richard Burnett was not an isolated incident, but occurred during a ten day crime spree in which Orbe repeatedly brandished a gun and sought to intimidate his victims with the gun, fired the gun twice at Lois Jones, injuring her, robbed Charles Powell and William Bottoms at gunpoint, assaulted Karen Glenn, Patricia Tuck and another woman and locked them in a closet, and led police on a dangerous high speed chase through the streets of Richmond. Moreover, the utterly unjustified use of force against Burnett and the inexplicable nature of all of Orbe's actions during his spree underscored his irrationality and essential dangerousness.

In sum, when the mitigating and aggravating evidence is considered as a whole, there is no reasonable probability that the quantum of additional evidence that Orbe argues should have been presented at the sentencing phase of the trial would have affected the outcome. Thus, Orbe's claims of ineffective assistance of counsel with respect to the sentencing phase of his trial were properly dismissed by the Supreme Court of Virginia for failure to show prejudice under *Strickland*, both individually and when considered in the aggregate. Accordingly, under § 2254(d), this claim must be dismissed.

█ Finally, in claim VI(C), Orbe argues that appellate counsel provided ineffective assistance by failing to argue an alleged jury instruction error on appeal. The penalty phase jury instructions included the following instruction:

> You are the judges of the facts. The importance and worth of the evidence is for you to determine. You must avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factors when imposing sentence. You should discharge your duties as jurors impartially, conscientiously and faithfully under your oaths and return such verdicts as the evidence warrants when measured by these instructions.

Counsel argued at trial that the instruction to "avoid any influence of sympathy" improperly directed jurors to disregard the mitigating evidence they heard during the sentencing. The trial court found the instruction to be proper, relying on *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), in which the Supreme Court had considered an identical instruction in a death penalty case and denied

relief. Orbe's counsel did not argue this error on appeal. On state habeas review, the Supreme Court of Virginia concluded that *Saffle* was controlling on the juror instruction issue, and therefore dismissed Orbe's related ineffective assistance of counsel claim under the performance prong of *Strickland*, because it is not unreasonable to fail to pursue a claim "unsupported by case law or statute." *See Orbe v. Warden*, No. 001708 at 13 (Va. September 10, 2001). Although a closer examination of *Saffle* reveals that *Saffle* was not strictly fatal to the claim, this claim is nonetheless properly dismissed under the performance prong of *Strickland.*

As Orbe correctly points out, the Supreme Court in *Saffle* denied relief not on the merits, but because such a ruling would have constituted a "new rule" under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and hence would have been improper on a federal habeas petition. *See Saffle*, 494 U.S. at 486, 110 S.Ct. 1257. Therefore, *Saffle* does not absolutely foreclose an Eighth Amendment objection to the instruction at issue.[44] Yet, a showing that an abandoned claim is not foreclosed by existing law does not itself demonstrate ineffective assistance. Under *Strickland*, Orbe must show that the failure to argue the claim was unreasonable, and that the failure was prejudicial. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Appellate counsel "need not (and should not) raise every nonfrivolous claim," and should instead select the strongest claims to "maximize the likelihood of success on appeal." *Id.* at 288, 120 S.Ct. 746. Over-

coming the presumption that counsel acted effectively and strategically is "[g]enerally" possible "only when ignored issues are clearly stronger than those presented." *Id.* (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986)).

Though not foreclosed, Orbe's claim with regard to the "antisympathy" instruction was quite weak. *Saffle* was ultimately decided on the *Teague* new rule grounds, yet the analysis associated with that ruling casts strong doubt on the merits of the "antisympathy" claim brought in that case. As noted in *Saffle*, "a large majority of federal and state courts" which considered similar antisympathy instructions found them to be constitutional, *id.* at 490, 110 S.Ct. 1257, and the Supreme Court had already rejected a challenge to a similar instruction on the same ground. *Id.* at 494, 110 S.Ct. 1257 (citing *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)).[45] In reaching the conclusion that finding the instruction unconstitutional would be a new rule under Teague, Saffle was carefully distinguished from prior precedent which had found certain statutes unconstitutional because they barred the presentation and consideration of relevant mitigating evidence in a capital trial. *Id.* at 490, 110 S.Ct. 1257. The instruction in *Saffle*, by contrast, merely directed how such evidence might be considered, but did not limit the type of evidence that could be considered. *Id.* In short, Orbe's jury instruction claim was nonfrivolous, but the likelihood of success, based on a careful reading of the applicable precedent, was quite low.

**44.** Orbe also argues that, even had *Saffle* foreclosed an Eighth Amendment claim, counsel could have argued that state law afforded greater protection than the Fourteenth Amendment. This argument is speculative at best, as Orbe is able to cite no apposite or persuasive state authority.

**45.** In *Brown*, the jury was instructed not to be "swayed by 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.'" *See Brown*, 479 U.S. at 542, 107 S.Ct. 837.

Orbe seeks to meet the *Gray* standard by arguing that this claim was clearly stronger than one of the claims his counsel did pursue, namely an argument concerning jury verdict forms that had already been procedurally defaulted, but was presented on direct appeal. His counsel briefed and argued that issue, even though he had failed to file a timely assignment of error on the issue, and the Supreme Court of Virginia had already denied his motion to amend the assignments of error in order to add it. Nonetheless, given the substantive weakness of the antisympathy instruction claim, it is not "clearly stronger" than the defaulted verdict forms claim. Thus, counsel did not act unreasonably in choosing not to pursue this jury instruction claim in the face of other, stronger claims.

### G. Claim XI: Denial of Federal Constitutional Protection in State Habeas Proceedings

The Supreme Court of Virginia denied Orbe's motion requesting the appointment of a psychiatrist. Because he is indigent, Orbe was unable to provide such testimony on his own. As a result, Orbe contends that his due process and equal protection rights under the Fourteenth Amendment were violated because he was precluded by the state from pursuing his constitutional claim of ineffective assistance owing to his indigent status.

Orbe filed this claim on September 3, 2002, as an addition to his federal habeas petition, four months after he submitted his petition according to the deadline established by Order of this Court,[46] and on the final day before the expiration of the one-year statute of limitations for federal habeas petitions.[47] Because Orbe argued that the briefing schedule violated his

right to the full one-year statute of limitations period established by 28 U.S.C. § 2244, he contended that leave of the Court under Rule 15(a), Fed.R.Civ.P., was not necessary to file this addition to his petition. Orbe also requested in the alternative that leave be granted under Rule 15(a) if necessary. Assuming without deciding that such leave was necessary, this Court granted leave to add claim XI to the petition.[48]

 Under clear Fourth Circuit precedent, a challenge to state habeas corpus proceedings cannot serve as a basis for federal habeas relief. *See Wright v. Angelone,* 151 F.3d 151, 159 (4th Cir.1998); *Bryant v. Maryland,* 848 F.2d 492, 493 (4th Cir.1988). A federal habeas petition can be entertained only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This does not provide a basis for a challenge to a ruling in a state post-conviction proceeding, because the petitioner is not "detained as a result of a decision of the Virginia Supreme Court in the state habeas action," but rather is in custody pursuant to the ruling of the original trial court. *See Wright,* 151 F.3d at 159.

 These precedents barring habeas relief based on a violation of rights that occurs during post-conviction proceedings are in tension with the cases holding that failure to provide indigent petitioners equal access to post-conviction proceedings is a violation of the federal Constitution. *See Smith v. Bennett,* 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961) (indigent prisoners must have access to post-conviction proceedings even if they cannot afford

---

46. *See Orbe v. True,* Civil Action No. 01–1845–A (E.D.Va. December 14, 2001) (Order).

47. This limitations period begins to run from the date of final judgment on direct review,

but is tolled by state post-conviction proceedings. *See* 28 U.S.C. § 2244(d)(1)(A) & (d)(2).

48. *See Orbe v. True,* Civil Action No. 01–1845–A (E.D.Va. September 10, 2002) (Order).

the docketing fee); *Lane v. Brown*, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963) (indigent prisoners must not be barred an opportunity for post-conviction review because of their inability to afford transcripts); *Long v. District Court of Iowa*, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966) (*per curiam*) (same). According to Orbe, the Supreme Court of Virginia's refusal to grant his request for a psychiatrist constitutes a similar technical bar to habeas relief which should be found unconstitutional under the Fourteenth Amendment. This argument is unpersuasive.

The "equality of access" guaranteed to indigents by *Smith, Lane,* and *Long* is not as broad as Orbe contends. It is well established, for example, that this "equal access" principle does not entitle indigents to state appointed counsel for post-conviction proceedings. *See Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987).[49] Just because an indigent petitioner cannot afford the same type of defense that a wealthier petitioner might, the state is not obligated to provide him such assistance. *See id.* (citing *Ross v. Moffitt*, 417 U.S. 600, 616, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)).[50]

Orbe's request is properly treated under *Ross*, not *Smith*. The Supreme Court of Virginia's refusal to consider Orbe's claim V(B)(5) cannot be compared to a refusal to consider a post-conviction appeal because of failure to file a transcript or pay a docketing fee. After all, Orbe's trial counsel could have requested that a psychiatrist be appointed, yet instead he chose a psychologist. Orbe's request for an additional expert is more aptly equated with a *pro se* petitioner's request for post-conviction counsel, which is clearly not a constitutionally protected right. *See Finley*, 481 U.S. at 555, 107 S.Ct. 1990. This is so because Orbe, unlike the defendants in *Smith, Long*, and *Lane*, was not completely denied access to post-conviction hearings by the Supreme Court of Virginia's refusal to allow him an *additional* expert. Indeed, far from being precluded from the post-conviction process, Orbe was successful in having the Supreme Court of Virginia consider and resolve all of Orbe's other claims in his habeas petition.

▮ Finally, even assuming, *arguendo*, that the Supreme Court of Virginia's refusal to appoint a psychiatrist gave rise to a constitutional violation, Orbe would still not be entitled to habeas relief because the error, if any, was harmless. *See Tuggle v. Netherland*, 79 F.3d 1386, 1391–92 (4th Cir.1996) (applying harmless error analysis to the state's refusal to grant a capital murder defendant expert psychiatric assistance). On federal habeas review, the standard for determining harmless error is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *See id.* at 1393.[51] As discussed above with regard to claim V(B)(5), *see supra* at p. 780, the additional psychiatric testimony sought by Orbe would have added little, if anything, to the

---

**49.** *Finley* stresses that "[w]e have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions." *Finley*, 481 U.S. at 555, 107 S.Ct. 1990.

**50.** As *Ross* makes clear, "[t]he duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process." *Ross*, 417 U.S. at 616, 94 S.Ct. 2437.

**51.** This is a higher threshold for the petitioner to meet in the quest for a writ of habeas than the harmless error threshold used on direct appeal, namely whether the error "was harmless beyond a reasonable doubt." *See id.* at 1392.

wealth of evidence on Orbe's mental health presented to the trial jury. Therefore, the omission of such evidence, even if a constitutional error, could not have had a "substantial and injurious effect" on the jury's deliberations with regard to the death penalty.[52]

In sum, the Supreme Court of Virginia's denial of Orbe's request to appoint a psychiatrist does not constitute a complete denial of access to post-conviction proceedings, as was the case in *Smith, Lane,* and *Long.* Thus, Orbe's claim XI, alleging constitutional error in a state post-conviction proceeding, is not cognizable on federal habeas under the rule in *Bryant. See Bryant,* 848 F.2d at 493 (4th Cir.1988). Even assuming, *arguendo,* that the Supreme Court of Virginia's refusal to appoint an expert was cognizable, it would be a harmless error in this case. Therefore, this claim must be dismissed.

### V. Conclusion

For all of the reasons stated above, Orbe's motion for funds for the appointment of a psychiatrist pursuant to 21 U.S.C. § 848(q)(9) must be denied and Orbe's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 must be dismissed in full. Accordingly, the stay of execution entered by Order dated December 6, 2001, must be vacated.

An appropriate order will enter.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

---

**52.** The Fourth Circuit reached the same conclusion in a very similar case. *See Swann v. Taylor,* 1999 WL 92435 at *9 (4th Cir. February 18, 1999). In *Swann,* the trial court refused to appoint a psychiatrist in addition to the psychologist already appointed to assist the defense. The Fourth Circuit held not only that this refusal was constitutional, but also that even were it unconstitutional, the error was harmless because the jury was nonetheless presented with the majority of the desired testimony regarding medications and future dangerousness. *See id.* at *8–9.